775 So.2d 263 (2000)
Michael Scott KEEN, Appellant,
v.
STATE of Florida, Appellee.
No. SC88802.
Supreme Court of Florida.
September 28, 2000.
Rehearing Denied October 31, 2000.
*265 Richard Jorandby, Public Defender, and Richard B. Greene, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and David M. Schultz and Sara D. Baggett, Assistant Attorneys General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon appellant Michael *266 Scott Keen (Keen). We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we reverse Keen's first-degree murder conviction, vacate his sentence of death and remand for further proceedings consistent with this opinion.

PROCEDURAL HISTORY
This is the third time this case has been before us. Keen was originally indicted in 1984 and charged with first-degree murder in the death of his wife, Anita Lopez Keen. After Keen was convicted and sentenced to death, we reversed both the conviction and sentence on appeal and remanded for a new trial based on prosecutorial misconduct. See Keen v. State, 504 So.2d 396 (Fla.1987), disapproved of on other grounds, Owen v. State, 596 So.2d 985 (Fla.1992). On remand, Keen was again convicted of first-degree murder and sentenced to death. As in the first appeal, we again reversed and remanded for a new trial based on the presence of unauthorized materials in the jury room, and the trial court's failure to conduct an in-camera inspection of the grand jury testimony of the State's star witness. See Keen v. State, 639 So.2d 597 (Fla.1994).
In his second retrial, Keen was once again convicted by the jury of first-degree murder on June 30, 1995. The penalty phase was held on August 14, 1995, and the jury[1] recommended, by a vote of seven to five, a sentence of life imprisonment without possibility of parole for twenty-five years. The trial judge held a sentencing hearing on October 19, 1995, and imposed a sentence of death on July 15, 1996, overriding the jury's advisory sentence of life imprisonment.[2]

MATERIAL FACTS

Guilt Phase
The following facts were adduced during Keen's first trial:
The evidence against Keen adduced at trial was primarily based on the testimony of Ken Shapiro. When Shapiro first moved to Florida in 1978 he was hired by Keen to work for a company managed by Keen. Shortly thereafter Keen invited Shapiro to become his roommate, a relationship which continued, with one brief interruption, until at least the end of 1981. Keen was very generous financially to Shapiro, providing him with numerous small loans and helping him out with rent and food; at one point Keen provided Shapiro with a Cadillac. There was no discussion that Shapiro was to repay Keen. According to Shapiro, some time in 1980 Keen informed him that he wished to retire before the age of forty and that the easiest way to accomplish this would be to find an unsuspecting girl, marry her, insure her life, murder her and then invest the proceeds. Keen met the victim, Anita Lopez, in late summer of 1980. Lopez was then twentyone years old, Cuban born and worked in a tractor factory. After Keen began seeing Lopez regularly, he told Shapiro, "I feel Anita is the girl." Shortly thereafter, Lopez moved in with Keen and *267 Shapiro at their Ft. Lauderdale home. By early 1981 Keen began to discuss with Shapiro the actual manner in which his plan could be accomplished. Keen's first suggestion was to push the victim off a high building, but eventually drowning was decided upon. In June 1981, two separate insurance policies were taken out each insuring Anita Lopez's life for $50,000. Both policies contained double indemnity provisions in case Lopez met an accidental death and both policies named Keen as the primary beneficiary.
Keen and Lopez were married on August 1, 1981. Shortly thereafter it was discovered that Lopez was pregnant which, according to Shapiro's testimony, forced Keen to accelerate the implementation of his plan. Shapiro testified that Keen threatened to kill him or his grandparents if he went to the authorities. Shapiro further testified that he felt "boxed in" and so remained quiet and did not tell anyone of Keen's plan. Keen allegedly told Shapiro that this would be Shapiro's way of repaying his debt to Keen and to "wipe the slate clean."
In late October or early November of 1981 Keen informed Shapiro that if Sunday November 15 was a nice day, he would proceed with the plan. Sometime in the late morning or early afternoon of the 15th, Keen and the victim left their canal-front home and traveled in Keen's boat, the Foreplay Too, through the intercoastal waterway. By prearrangement, Keen and the victim stopped at a waterfront bar, Tug Boat Annie's; shortly thereafter, Shapiro arrived at the bar. After spending some period of time there the three boarded the boat and headed out into the ocean. When the boat was approximately fifteen to eighteen miles out, Keen, who had been driving, put the boat in neutral, walked to where the victim was standing and pushed her from behind into the ocean. Keen told Shapiro to move the boat out of the victim's range; Keen took over the controls and kept the boat out of the victim's range. According to Shapiro, the plan was to actually watch the victim drown so that her body could be recovered and Keen could then collect the insurance proceeds. However, darkness set in and Shapiro and Keen lost sight of the victim. They returned to Keen's backyard dock whereupon Shapiro called the Coast Guard and the Broward County Sheriffs office. Keen gave statements to the authorities that at some point the victim, who was four to five months pregnant at the time, went down into the cabin below to rest and that when they returned home, she was not there. A week later Shapiro gave a sworn statement to the sheriffs office corroborating Keen's version of an unexplained accident. Shapiro also repeated the story to an attorney hired by Keen to initiate the insurance claims process.
The next time Shapiro gave a statement concerning these events was in August 1984 when he was approached by detectives from Broward County. [Note 1] In this statement Shapiro related the same version of events that he later testified to at trial. Following Shapiro's August 1984 statement Broward County Detectives Scheff and Amabile located Keen who was living under an assumed name in Seminole County. Keen was arrested on August 23 at his place of business and was returned to Broward County on August 24.
[Note 1:] It appears that appellant's brother, Patrick Keen, contacted a representative of one of the companys[companies] who had insured Anita Lopez Keen's life, offering to tell the "true" story of her death in exchange for a finder's fee. The representative then contacted the Broward County authorities who in turn contacted Shapiro. At trial Shapiro explained that he finally told the truth about what had happened to the victim because his knowledge of the murder was devastating him and that he knew sooner or later he would *268 have to tell someone. He further explained that he was testifying without immunity because he wanted to get the story off his chest.
Keen, 504 So.2d at 397-98.
Former Broward County deputy sheriff Hector Mimoso testified that he was dispatched to Keen's residence the night of Anita Keen's disappearance. He related that while he was asking Keen questions, Shapiro "was giving the answers." Keen reportedly "spent all of the time sitting on the couch and he was very calm." Mimoso inspected the boat and found it "very tidy, very well kept, put away, like they had just been cleaned." He also testified that he climbed up to the flying bridge and, in observing where it was in relation to the boat's stern, said "it would have been possible to hear a scream or splash of water." Mimoso testified that he returned to the house and asked Keen if he had heard a scream or splash of water, to which Keen replied that he had not. On cross-examination, Mimoso stated that he did not start the boat engines to determine how loud the sound would be and what could be heard with the engines running. Mimoso also reiterated that Shapiro answered all of the questions until he told Shapiro to cease and desist, and he observed Shapiro pacing around and hovering near where Mimoso was questioning Keen.
Detective Don Scarborough of the Broward County Sheriffs Department testified that he interviewed Keen on December 10, 1981, a tape recording of which was published to the jury. Keen related in that statement that Anita had grown tired as the boat returned to shore and went down to the cabin to sleep, but she was not there when the boat docked at his home. He also stated that the "engine was loud... [t]he music was blaring and we were talking. I didn't hear anything. I don't think Ken did either, and we did not see her or hear her come out during the course of this time that we were coming back."
The prior sworn testimony of Don Johnson, a Life of Virginia sales representative, was read into evidence.[3] Servicing responsibility for Keen's life insurance policies was transferred to Johnson's territory when Keen moved to Fort Lauderdale from the Orlando area in June 1981. After being contacted by Johnson and not changing his own policies, Keen obtained a $50,000 double indemnity policy insuring Anita's life, meaning it would pay the beneficiary, Keen, an additional amount if Anita died an accidental death.
Maddie Genova, a former Prudential Insurance Company office worker, appeared at trial and identified a second $50,000 double indemnity, whole life insurance policy insuring the life of Anita Keen, for which Keen was also the beneficiary. This second policy was obtained when a Prudential agent made a cold call on the Keens. Keen himself already had $115,000 in life insurance with Prudential.
Detective Sergeant Philip Amabile of the Broward County Sheriffs Office (BCSO) testified that he began an investigation in this case in August 1984 because BCSO "received information from two insurance companies that they had received information that the case was not a missing persons case, but a murder." (Emphasis added.) He also testified that after talking to Patrick Keen, the investigation of this case was pursued. Amabile and Detective Scheff then proceeded to interview Shapiro for several hours, after which they arrested Keen the following day. Amabile testified that Keen provided several versions of what had transpired on the boat, beginning with his 1981 statement that Anita was not found upon return to the dock. His second version of the events described Anita and him standing on the side of the boat when they were shoved into the ocean.[4] Keen then allegedly stated *269 that he swam back to the boat, assumed the controls of the vessel from Shapiro who was "frozen like a zombie at the controls," returned to the area where they had been pushed overboard, and began searching for Anita. They returned home only after an hour of fruitless searching. Keen maintained that what transpired at sea was an accident.
Michael Moran, a convicted felon, testified that he had been incarcerated with Keen in late 1984.[5] He stated that Keen asked him to kill Shapiro. Moran expected to be released soon from a prior sentence and he allegedly was to confront Shapiro, make him write a confession and a suicide note, and then hang him. Moran testified that in furtherance of this plan, Keen gave him Shapiro's grandparents' address, the phone number of his family's liquor store in New York, and the date that Shapiro was to be deposed. Moran also related that he was to receive $20,000 for his services. The State placed in evidence an envelope that Moran claimed contained his handwriting as well as that of Keen. Moran's Broward County armed robbery charge was ultimately dropped after he testified against Keen. He is currently serving a life sentence without possibility of parole in Michigan for first-degree murder.
Dale Nelson, an investigator with the State Attorney's office, testified that he received an envelope from Moran at the Broward County Jail in October 1984, which he then transported to the FBI lab in Washington. Nelson took fingerprints from Keen in 1987. Max Jarrell, a fingerprint examiner with the FBI, testified that one latent print on the envelope matched Keen and none matched Moran.
The defense placed in evidence Keen's Prudential life insurance policy, the letter of nonprosecution of Shapiro from Assistant State Attorney Robert Carney to Shapiro's attorney, and copies of Moran's motion to set bond and order reducing the bond. The defense presented no testimony. Keen chose not to testify after being advised of his constitutional rights by the trial judge.

Penalty Phase
The State presented no evidence during the penalty phase. The defense read the testimony of Keen's mother, Bonnie Keen, into evidence. Responding to questions from Keen's attorney, she testified that Keen was the oldest of four children; was very protective and nurturing toward his siblings; excelled in the arts, including piano, in which he competed in the International Piano Guild; was a high school honor society member; played high school football; was deserted by an alcoholic father at the age of seven; assumed the role of head of the family until he went to college; and was always a good son and brother. The defense also introduced official Department of Corrections records showing that Keen had only one minor disciplinary infraction since his incarceration in the state prison system in 1985. The State presented no rebuttal evidence.

APPEAL
Keen raises nineteen claims of error,[6] *270 several of which we resolve summarily.[7] We address the remaining issues in turn.

MOTION FOR MISTRIAL AFTER INTRODUCTION OF HEARSAY
In his first claim of error, Keen contends that the trial court improperly allowed the State to introduce hearsay evidence through Detective Amabile under the theory of "explaining the police investigation." Keen argues that this was harmful error under our prior caselaw and warrants reversal for a new trial. See Wilding v. State, 674 So.2d 114 (Fla.1996); Conley v. State, 620 So.2d 180 (Fla.1993); State v. Baird, 572 So.2d 904 (Fla.1990). We must first analyze these decisions which address the substance of the matters Keen has challenged.
In Baird, the defendant was charged with multiple counts of racketeering and bookmaking. See 572 So.2d at 905. At trial, an FDLE special agent was allowed to testify that he had "received information that he [Baird] was a major gambler and operating a major gambling operation in the Pensacola area," in response to the prosecutor's question as to whether he had targeted Baird for prosecution. Id. On review, we rejected the State's argument that the testimony established the special agent's motive in investigating Baird because, at that point in the trial, "no evidence of selective prosecution or bad motives... [by] the investigating officers had been offered by the defense." Id. at 907. We also determined:
[W]hen the only purpose for admitting testimony relating accusatory information received from an informant is to show a logical sequence of events leading up to an arrest, the need for the evidence is slight and the likelihood of misuse is great. In light of the inherently prejudicial effect of an out-of-court statement that the defendant engaged in the criminal activity for which he is being tried, we agree that when the only relevance of such a statement is to show a logical sequence of events leading up to an arrest, the better practice is to allow the officer to state that he acted upon a "tip" or "information received," without going into the details of the accusatory information.

Id. at 908 (emphasis added). We ultimately found the error harmless because the testimony was only elicited prematurely; was offered to rebut Baird's contention that he was selectively prosecuted; was neither focused upon nor brought to the jury's attention again; and, finally, because the State based its case on substantial evidence properly admitted during trial. See id.
*271 In Conley, the defendant was charged with and convicted of armed burglary, three counts of sexual battery with a deadly weapon, and armed robbery with a firearm. See 620 So.2d at 182. Testimony concerning a police dispatch report which originated when an unidentified person called the police was admitted into evidence. See id. At trial, a police officer testified that he "received the call in reference to a man chasing a female down the street ... [t]he man supposedly had some type of gun or rifle." See id. During closing argument, the prosecutor argued that this testimony, combined with the alleged victim's testimony, proved that the defendant carried a rifle during the criminal episode. See id.
On review, we stated:
Even if we were to conclude that the testimony was not used to prove the truth of the matter asserted, the contents of the statement were not relevant to establish a logical sequence of events, nor was the reason why officers arrived at the scene a material issue in the case. As we said in Baird, the inherently prejudicial effect of admitting into evidence an out-of-court statement relating accusatory information to establish the logical sequence of events outweighs the probative value of such evidence. Such practice must be avoided. Baird, 572 So.2d at 908; see § 90.403, Fla. Stat. (1989).
Conley, 620 So.2d at 183 (emphasis added) (citations omitted). Under this analysis, we found the police officer's improper testimony to be harmful error after recognizing the lack of corroboration as to whether the defendant used a firearm, in combination with evidence contradicting the alleged victim's testimony. See id.
We found Conley applicable the following year in connection with the admission of testimony from police officers regarding conversations with a witness who later appeared to testify during the trial. See Caruso v. State, 645 So.2d 389 (Fla.1994). Specifically, we noted that "Officer Raimondi said they went to [the witness] to ask her about a white male she reported having seen at midnight December 5. Officer Faby said Walker gave him a description of the man she saw, and the description matched Caruso." Id. at 395. We rejected the State's contention that the testimony was not inadmissible hearsay, noting that in Conley we held "that the prejudice of out-of-court statements used to relate accusatory information but offered simply to establish the logical sequence of events outweighs the probative value of such evidence, rendering it inadmissible." Caruso, 645 So.2d at 395. Although we found error in the admission of such evidence, as in Baird, we found the error harmless beyond a reasonable doubt, concluding that the inadmissible evidence was no more than a prior consistent statement to corroborate the witness's testimony and the declarant was cross-examined on the topic, which mitigated the prejudice. See id.
Most recently, in Wilding v. State, 674 So.2d 114 (Fla.1996), receded from on other grounds, Devoney v. State, 717 So.2d 501 (Fla.1998), we wrote:
First, we agree that it was error to admit testimony that the lead detective in the murder investigation received an anonymous tip that named Neil Wilding in connection with the murder.
During direct examination of the detective, the prosecutor asked whether the anonymous tip received by the detective gave the name Neil Wilding. The detective was allowed, over objection, to answer that it did. The detective further testified that the department began its investigation of Wilding from the tip and "verified a lot of the information that we received in the tip and developed additional information." The detective went on to explain that the police interviewed Wilding's family and friends.
The State maintains that this testimony was properly admitted because, given the fact that it took four years to arrest *272 Wilding for the murder, the testimony was relevant "to show the logical sequence of events regarding the murder investigation." We cannot agree.
While it might have been permissible to allow the detective to testify that police began the investigation because of a "tip" or "information received," this testimony clearly went beyond that authorized in State v. Baird, 572 So.2d 904 (Fla.1990)....
We recognize that the information received in the tip in this case was not detailed to the jury to the same extent as was the information received in Baird. However, similar evils are involved in both cases. As noted by the Third District Court of Appeal in Postell v. State, 398 So.2d 851, 854 (Fla. 3d DCA), review denied, 411 So.2d 384 (Fla.1981) (footnote omitted), where "the inescapable inference from testimony [concerning a tip received by police] is that a non-testifying witness has furnished the police with evidence of the defendant's guilt, the testimony is hearsay, and the defendant's right of confrontation is defeated, notwithstanding that the actual statements made by the non-testifying witness are not repeated."

In this case, even though the detective never specifically repeated what the informant told him, the clear inference to be drawn from the testimony was that the informant had implicated Wilding in the murder and the information received was reliable because it had been verified by police who talked to Wilding's family and friends. Thus, the jury was led to believe that an unidentified person, who did not testify and was not subject to cross-examination, had given the police evidence of Wilding's guilt, evidence that upon investigation proved to be reliable. Even if the testimony was offered simply to show the logical sequence of events regarding the murder investigation, its probative value clearly was outweighed by its prejudicial effect. As a general rule, the investigation leading to the defendant's arrest is not at issue in a criminal trial. Placing information before the jury that a non-testifying witness gave police reliable information implicating the defendant in the very crime charged clearly could affect the verdict. More importantly, because Wilding could not cross-examine the unidentified witness, admission of this testimony violated his confrontation rights.
Unlike the testimony relating the information received from the informant in Baird, this testimony was not merely elicited prematurely. Baird, 572 So.2d at 908 (it was error to admit testimony relating information received from informant because the testimony was elicited before State's motive for investigating defendant was put in issue on cross-examination). In this case, the only issue the testimony could have gone to other than to establish the sequence of events leading to the investigation was Wilding's identity as the killer.

Moreover, almost immediately after the testimony concerning the steps taken to verify the anonymous tip, the detective testified that in an attempt to locate Wilding, the department "secured air time with America's Most wanted." Defense counsel immediately objected, moved for a mistrial, and pointed out that the fact that Wilding had been the subject of an "America's Most Wanted" episode had been the subject of a motion in limine. The fact that Wilding was the subject of this widely viewed television program clearly was irrelevant and highly prejudicial.
When this error is considered in combination with the testimony about the anonymous tip linking Wilding to the murder, neither error can be considered harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). This is particularly true in light of the fact that members of the jury were already discussing their concern about Wilding, whom they now *273 knew had been the subject of "America's Most Wanted," having access to their personal information. Thus, on this record, we cannot say that there is no reasonable possibility that these errors affected the verdict. DiGuilio.

Wilding, 674 So.2d at 118-19 (emphasis added). As was well articulated by the court in Postell v. State, 398 So.2d 851 (Fla. 3d DCA 1981), it is impermissible for the State to have the benefit of statements from mystery witnesses or sources without the defendant having the right of confrontation and cross-examination. "In short, the insidious diminution of the precious rights of confrontation and cross-examination, through some literal application of the rule against hearsay, cannot be tolerated." Id. at 856.
With that background in mind, a review of the relevant testimony of Detective Amabile in this case demonstrates:
Q: When did you first get involved in investigating [Anita Keen's] disappearance or death?
A: I became involved in the case in August of 1984.
Q: At that point, what had been the status of the investigation?
A: The case had remained open and it was classified only as a missing persons case.
Q: Why did you begin to investigate the case at that time?
A: The office had received information from two insurance companies that they had received information that the case was not a missing persons case, but a murder.

Q: As a result of receiving that information, then, what did you do in the reopening of the investigation?
A: The initial call to the office entailed that a Patrick Keen[8]
. . . .
Q: Without telling us what you said, first of all, I would like to know, do you know Patrick Keen?
A: Yes, I do.
Q: Have you met Patrick Keen?
A: Yes, I did.
Q: And without telling us what was said during this period of time in August of '84, did you talk to Patrick Keen?
A: Yes, I did.
Q: And do you know what Mr. Keen's relationship was to Michael Keen?
A: Yes, I do know.
Q: And what was that relationship?
A: They are brothers.
Q: Now, as a result of talking to [Patrick Keen], did you pursue your investigation in this case?
A: That is correct.
Q: Tell us what you did?[9]
. . . .
Q: Where did your investigation take you from that point?
A: I then made contact with a gentleman by the name of Kenneth Shapiro.
(Emphasis added.)
Based on this exchange, we conclude that our reasoning in Wilding is directly on point. The challenged comments in this case are similar to the first error cited in Wilding, if not more blatant, because here we do not have an unidentified "informant" but two life insurance companies and the defendant's own brother. To be sure, this case lacks such a prejudicial conjunction as the "America's Most Wanted" issue in Wilding. Nonetheless, without an opportunity for cross-examination, the unmistakable link drawn between the "insurance companies ... receiv[ing] information that the case was ... a murder," Patrick Keen, the defendant's *274 own brother who did not testify, and Shapiro, the State's key witness, comprises a uniquely prejudicial relationship from which the jury could have most certainly inferred that the life insurance companies had investigated this case and had evidence that Anita had been murdered, and that Patrick Keen had information that his brother was guilty of murder. The inescapable inference from this hearsay material was that the investigation had produced evidence that Anita's disappearance was in actuality a murder. Considering the sources of the information, such an inference would tend to bolster Shapiro's corresponding testimony. This is especially so because Detective Amabile testified shortly thereafter that this chain of events and information received "led to the preparing of an arrest warrant for the defendant, Michael Keen."
This case closely parallels Wilding in that "the clear inference to be drawn from [Amabile's] testimony" was that the insurance industry with its resources had investigated the disappearance and discovered a murder, that Keen's own brother had implicated him in the murder, and that "the information received was reliable because it had been verified by police who talked to [Shapiro]." Wilding, 674 So.2d at 119. As a result, "the jury was led to believe that [the insurance companies and defendant's brother], who did not testify and [were] not subject to cross-examination, had given the police evidence of [Keen's] guilt, evidence that upon investigation proved to be reliable." Id. Because Wilding is squarely on point with regard to this type of testimony, we must next determine whether the error here was properly preserved and the standard of review we should apply in our analysis.
Here, the State argues that the subject matter of the testimony challenged was not hearsay because it was not elicited to prove the truth of the matter asserted, but only to show a sequence of events. We reject such contention. First, this Court clearly instructed in Baird, reaffirmed in Conley, and confirmed in Wilding that an alleged sequence of events leading to an investigation and an arrest is not a material issue in this type of case. Therefore, there is no relevancy for such testimony to prove or establish such a nonissue. When the only possible relevance of an out-of-court statement is directed to the truth of the matters stated by a declarant, the subject matter is classic hearsay even though the proponent of such evidence seeks to clothe such hearsay under a nonhearsay label. See § 90.801(1)(c), Fla. Stat. (1999); Wright v. State, 586 So.2d 1024 (Fla.1991) (holding that where the only relevance of an out-of-court statement is to prove the truth of the matter asserted it is hearsay and is not rendered admissible when the non-hearsay purpose is not relevant).
Second, facts concerning the purported determination by insurance companies after investigation that this case involved a murder, not an accident, were used by the State during closing argument for substantive support not "sequence of events" purposes. Thus, regardless of the purpose for which the State now claims the testimony to have been directed, the evidence was in fact used to prove the truth of the content rendering the content of the statement hearsay. See Conley (holding that regardless of the purpose for which a party claims it has offered evidence, when an out-of-court statement is used as evidence to prove the truth of the matter asserted, such statement constitutes hearsay and falls within no recognized exception).
Next, with the predicate of this Court having previously announced on numerous occasions that the admission of this type of evidence is inherently prejudicial, it must be determined if this issue has been properly preserved for review and the standard of review applicable for proper determination. Initially, although the sequence of events in the investigation leading to an arrest was not a material issue in this case, the preliminary question directed to Detective Amabile as to why an investigation *275 was revived was not facially objectionable upon the basis of clearly calling for hearsay testimony. Had the detective simply referred to the event (phone call or tip), without blurting out the hearsay content (insurance company investigation determined that a murder had occurred), a hearsay objection would not have been appropriate. As we cautioned in Baird, if the relevance was only directed to a sequence of events, the officer could state no more than the existence of a "tip" or generally that information had been received.
The misdirection of the issue did not terminate with the detective's initial statement, but the State then immediately proceeded to connect the inadmissible accusatory information to Keen's brother and then immediately to Shapiro and then to Keen. As soon as the State proceeded to create a nexus between Keen's brother and the insurance investigation which had concluded that a "murder" had occurred, an objection was voiced and a request for mistrial was submitted and denied.
This Court has repeatedly admonished that the admission of this type of evidence is inherently prejudicial as can be seen in Wilding, Conley, and Baird. Here, the improper evidence was injected into the proceedings by the State's witness, an experienced detective, selectively volunteering inappropriate matters to a jury. Our analysis leads us to conclude that the events here are similar to those considered by this Court in Czubak v. State, 570 So.2d 925 (Fla.1990), in which a witness, in response to cross-examination by defense counsel, volunteered inadmissible facts concerning a prior unrelated collateral crime and wrong of the defendant by referring to the defendant as a prior convict. As in the present case, the defendant in Czubak did not receive an adverse ruling as to the initial admissibility of the inappropriate evidence. However, a motion for mistrial submitted after the inappropriate evidence had been volunteered was denied just as occurred in the present case. In Czubak, this Court specifically stated the admission of the evidence of an unrelated collateral crime (which consisted of referring to the defendant as a convict) was presumptively harmful. The Czubak court then proceeded to reverse the conviction by applying the standard that such error could be considered harmless only if it could be said beyond a reasonable doubt that the verdict could not have been affected by the error.
In the present case, the inadmissible matter was injected by the State through volunteered testimony of an experienced detective. The nature of the inadmissible materials here consisting of very harmful hearsay evidence indicating that the defendant was guilty of the crime charged is far more egregious and harmful than the admission of material directed to an unrelated collateral wrong. Additionally, preservation of the issue for review in this case is identical to the posture of the case in Czubak. We conclude that the standard applied in Czubak should be applied here under these particular circumstances.
The Czubak decision was predicated upon principles announced by this Court in Straight v. State, 397 So.2d 903 (Fla.1981), and Castro v. State, 547 So.2d 111 (Fla. 1989). The Straight court recognized that the admission of evidence concerning an unrelated collateral wrong is presumptively harmful and the Castro court applied the DiGuilio[10] harmless beyond a reasonable doubt standard of review. This Court applied these two principles of law in Czubak under circumstances identical to those involved in the present case. This trilogy of cases applies here and would require a new trial. We conclude that the State's position would create an unacceptable approach which would permit the State to receive the benefit of volunteered hearsay testimony directed to the guilt of the defendant of the crime charged. This type of evidence simply should not have been *276 permitted, and when the motion for mistrial was made after such evidence came before the jury, a mistrial should have been granted. For these reasons, the State's analysis of the hearsay issue cannot be accepted under these circumstances.
In this case, the jury could have legitimately relied on Shapiro's extensive testimony, the circumstantial evidence of the two insurance policies on Anita Keen, and Michael Moran's testimony. However, we should not ignore the direct relationship between the erroneous introduction of the out-of-court statements and Shapiro's devastating testimony, especially where the credibility of the two principals to the crime was the key issue in the case. Keen, 504 So.2d at 401 (acknowledging that "the real jury issue in this trial centered on the credibility of Shapiro versus the credibility of Keen"). The out-of-court statements produced by the State provided a strong foundation that bolstered and supported Shapiro's detailed account of the planning and execution of Anita's murder. In essence, the State was able to present three witnesses for the price of one, with the bonus that only Shapiro testified and was subject to cross-examination. Patrick Keen never took the stand, nor did the insurance company representatives who forwarded the information that this was not a missing persons case, but a "murder."[11]
The State repeatedly reminded the jury during closing argument that claims for life insurance benefits were pending against the insurance companies with Keen having filed a petition to have Anita presumed dead to collect benefits. This line of argument, of necessity, inherently flowed from the State's theory of this case which was predicated upon a homicide to obtain life insurance proceeds. In the concluding moments of the State's rebuttal argument, the jury's attention was again directed to the investigating detective being advised by the insurance company that Anita Keen's disappearance was a homicide, not an accident. The closing argument was certainly less detailed than Detective Amabile's testimony, but the jury was again informed of the out-of-court statement that Keen had engaged in the criminal activity for which he was being prosecuted. Cf. Baird, 572 So.2d at 908 (finding similar error harmless where challenged testimony was only elicited prematurely, rebutted a defense contention, and was not brought to the jury's attention again, and because State relied on properly admitted evidence). The closing argument, however brief, related the same highly prejudicial elements placed before the jury by Amabile's testimony, i.e., the insurance companies obtained information that Anita's death was a "murder" not an accident. Although it was unstated during the closing argument that the information came from Patrick Keen, that point had been unambiguously made during Amabile's testimony. This was highly prejudicial with no countervailing probative value. See Wilding, 674 So.2d at 119 (reciting general rule that "the investigation leading to the defendant's arrest is not at issue in a criminal trial"). Thus, this evidence was hearsay, it was not relevant, and its probative value was far surpassed by its prejudicial impact. These factors all lead to the inescapable conclusion that the conviction must be reversed and the case remanded to the trial court.

WITNESS COMMENT REGARDING PRIOR TRIAL
Keen asserts that the trial court erred in denying his motion for mistrial after state witness Maddie Genova mentioned the "last trial" in this case. This claim is without merit.
*277 Our decision in Terry v. State, 668 So.2d 954 (Fla.1996), squarely addresses this issue. There, we reiterated that "motions for mistrial are addressed to the trial court's discretion and should be granted only when necessary to ensure that a defendant receives a fair trial." Id. at 962. We also noted that a party may not invite error and then raise the issue on appeal. See id.; accord Knight, 746 So.2d at 432; San Martin v. State, 705 So.2d 1337, 1347 (Fla.1997).
In analyzing an earlier case,[12] we reasoned that "our analysis focused on whether the witness's answer was responsive to the question and whether counsel could have anticipated the witness's response." Terry, 668 So.2d at 962. In affirming the trial court's denial of the defendant's motion for mistrial based on the detective's comments that he was a suspect in other armed robberies, we quoted approvingly from the trial court's ruling. See id. at 962-63. The trial court correctly framed the issue when it wrote that it needed to "determine if that was a fair response to the question and whether or not [the detective] intentionally tried to get something in front of this jury that he shouldn't have." Id. at 963.
Here, the challenged comment arose during the following exchange:
Defense counsel: Now, have you yourself ever worked into the sale of policies?
Genova: No.
Defense counsel: And Mr. Keen never collected any benefits on this policy, did he?
Genova: That, I don't know.
Defense counsel: Well, you said you have the whole Prudential file there. If you do, you would know that.
Genova: This was from his last trial. This was not the complete file up to date.
Defense Counsel: you just said that you brought the whole file?
Genova: I didn't bring this in.
Additionally, throughout Shapiro's cross-examination, the defense made exhaustive references to his prior testimonies. Clearly, the average juror could reasonably infer there had been prior proceedings in this case. The fact that the present trial was occurring in 1995, when it was absolutely clear that Anita died in 1981 with Keen being first incarcerated in 1984, certainly allowed jurors to reasonably conclude that something had previously occurred in the case. Genova's brief, innocuous statement only referred to the "last trial," and did not mention whether it was civil or criminal, its outcome, or any details of the prior trials. Further, this situation is similar to that discussed in Norton v. State, 709 So.2d 87, 94 (Fla.1997), wherein we explained that "[a]lthough an unsolicited comment is not `invited' where it is unresponsive to the question asked, the defense counsel in the instant case, in an unsuccessful attempt to make a point on cross-examination, merely received a direct answer in response to his question." We conclude that these circumstances did not warrant the severe remedy of a mistrial. Accordingly, we find no error in the denial of Keen's motion for mistrial.

PROHIBITION ON INTRODUCTION OF LETTER
Keen contends that the trial court erred in refusing to allow the introduction of a letter which prosecution witness Michael Moran wrote to Judge O'Brien, the trial judge in his Michigan case. Keen argues that the letter was admissible[13] as direct evidence of Moran's motive for testifying; *278 as a prior inconsistent statement; and because the prosecution opened the door on direct examination. This claim is without merit.
The relevant portion of the letter[14] reads as follows:
The circumstances which involved me were not of my making, nor were my actions to the circumstances made with the intent to participate in crime, or injure, or kill anyone. I did not know for certain that a crime had been committed until I was arrested in Iowa, in an area that I am well known to police and other citizens. After my arrest and upon advise of my attorney, I not only identified but caused the arrest and testified against the real killer. Because of my innocence I cooperated freely and I refused a plea bargain which was offered for that cooperation.
The circumstances which led to my being in Michigan can be verified by the prosecutor, Mr. King and Detective Sergeant Webb. While I was incarcerated in the Iowa State Penitentiary I was extradited to Fort Lauderdale, Florida as a prosecution witness. I testified against a man who had killed his nineteen year old pregnant wife and then attempted to hire someone to kill the States' chief witness. While in Florida's custody, Iowa paroled me without my knowledge. After testifying, Florida authorities learned that I had been paroled and released me without provision or program.
Keen's main argument is that this letter revealed Moran's motive in testifying: "He is going out of his way to mention his Florida testimony to the Michigan judge prior to sentencing." Appellant's Initial Brief at, 33. However, despite the fact that Moran was vague about some of the letter's contents,[15] Keen cannot escape the fact that Moran's letter to Judge O'Brien, the Michigan trial judge, was written in 1987. Consequently, the letter can have no conceivable relevance to Moran's motive for testifying in 1995, years after he was sentenced by Judge O'Brien to life in prison without the possibility of parole. Further, because of that fact, this is a collateral issue where defense counsel was bound by Moran's answer to his question of whether he testified against his codefendant in Michigan. See Charles W. Ehrhardt, Florida Evidence § 608.4 at 440 (1999 ed.) (observing that "[i]f the witness has made a prior inconsistent statement concerning a collateral matter, the cross-examining counsel may question the witness about the statement, but he or she must `take the answer'"); see also Caruso, 645 So.2d at 394 (reiterating well-established rule that "if a witness is cross-examined concerning a collateral or irrelevant matter, the cross-examiner must `take' the answer, is bound by it, and may not subsequently impeach the witness by introducing extrinsic evidence to contradict the witness on that point").

COLLATERAL OFFENSE AND OPINION EVIDENCE
Keen next argues that the trial court erred in admitting improper collateral offense evidence-the tape-recorded conversation he had with Shapiro. We find this claim procedurally barred and, even assuming *279 it was properly before us, it is without merit.
First, Keen acknowledges that he did not object to the introduction of the taped conversation into evidence. Consequently, the State is correct that this claim is procedurally barred because Keen failed to raise a contemporaneous objection. Norton, 709 So.2d at 94. Thus, Keen can only resort to claiming fundamental error, "defined as error that `reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998) (quoting Kilgore v. State, 688 So.2d 895, 898 (Fla.1996)). Under that stringent standard, we find no fundamental error.
Moreover, we would find no merit in this claim even if it had been properly preserved for appellate review. Keen's contention centers on the following excerpt of the taped conversation between him and Shapiro, with Shapiro stating: "And in, in light of your past history, even she [Keen's girlfriend] believes that you're guilty." Keen argues that the comments about his "prior history" and that history causing his girlfriend to believe in his guilt constituted improper collateral offense evidence. We disagree because Shapiro's testimony was the centerpiece of the State's case against Keen. It was an exhaustive, first-person account of the planning and execution of a murder, compelling in both detail and volume. As such, if accepted by the jury, it was more than enough to support a guilty verdict and precludes a fundamental error finding on this claim.
Further, the "similar evidence" which Keen refers to as triggering a reversal in his first direct appeal occurred when Keen was cross-examined while testifying on his own behalf. See Keen, 504 So.2d at 401. He was asked, "Didn't you describe to Ken Shapiro how you and Patrick Keen had tried to beat Patrick Keen's wife to death with a rock in North Carolina in 1973?" Id. We reversed because "this improper question was so inflammatory and prejudicial that it destroyed Keen's right to a fair trial." Id. Additionally, this was done after Keen had admitted to a prior felony conviction on direct examination, which had nothing to do with the 1973 incident in North Carolina. See id. at 402 n. 4. That sequence of events is much more egregious than the incident complained of here.

SPECIAL JURY INSTRUCTION ON JURISDICTION
Keen's next claim of error is that the trial court gave a one-sided jury instruction on jurisdiction that improperly highlighted the State's theory. This claim is without merit.
The jury instruction fully comports with our holding in Lane v. State, 388 So.2d 1022, 1029 (Fla.1980). The instruction explained what was required to find that territorial jurisdiction was proper in this case, and simply used "premeditation" as an example. Notwithstanding the challenge, the evidence certainly suggested that premeditation occurred in Florida, as Shapiro provided extensive testimony on that element of the crime.

RESTRICTED CROSS-EXAMINATION OF STATE WITNESS
Keen next argues that the trial court erred in prohibiting him from cross-examining Moran concerning his intent to invoke the Fifth Amendment. We find this issue is moot because whatever merit the claim may have, Moran did testify for the State against Keen, and his testimony inculpated Keen in his design to kill Shapiro.
As noted in Keen's third claim, Moran is under a sentence of life without the possibility of parole in Michigan.[16] Therefore, any reluctance or unwillingness to testify *280 on his part was completely irrelevant because he did testify and his testimony had no effect on his ongoing sentence of life imprisonment in Michigan. Further, as the State correctly presents, defense counsel cross-examined Moran about his reluctance to testify and Moran conceded that he did not want to testify.

MOTION TO SUPPRESS STATEMENTS TO POLICE
Keen next asserts that the trial court erred in denying Keen's motion to suppress the statements he made to police. This claim is without merit.
We fully addressed this issue in Keen's first direct appeal and found it to be without merit. Keen, 504 So.2d at 399-400. While Keen makes much of our later decision in Owen v. State, 596 So.2d 985 (Fla. 1992), in that case we only disapproved of the following reasoning, 504 So.2d at 400: "Keen's sixth amendment claim fails because at the time the statement was made formal charges had not been filed against him and, therefore, adversary proceedings had not yet commenced." See 596 So.2d at 990 (receding from Keen "to the extent it is inconsistent with the Sixth Amendment analysis above"). The salient passage from that analysis was that "[a]lthough adversary judicial proceedings may commence in a number of ways-via `formal charge, preliminary hearing, indictment, information, or arraignment,' [Kirby v. Illinois,] 406 U.S. [682,] 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 [(1972),] the federal Court and commentators are in agreement that such proceedings clearly have begun when an accused is placed in custody, haled before a magistrate on a warrant or formal complaint, and then tentatively charged with a particular crime at this initial appearance or `arraignment.'" Owen, 596 So.2d at 988-89. We further reasoned that "[o]nce the right attaches, an accused is entitled to assistance of counsel at each `critical stage' of the prosecution, including police questioning." Id. at 989. Consequently, "[w]here the right has attached and been invoked, any subsequent waiver in the absence of counsel during police-initiated questioning is invalid." Id. (emphasis added).
In rejecting this same argument on various bases in the first direct appeal, we made three distinct references to the fact that Keen "was advised on four separate occasions of his right to remain silent and his right to counsel, and he signed a waiver before giving a statement." Keen, 504 So.2d at 400 (emphasis added). Although we recognize that the specific reasoning in our earlier denial of Keen's sixth amendment claim is no longer valid, we find that fact immaterial because it is undisputed that Keen never invoked his right to counsel, despite numerous opportunities to do so. Accordingly, we reaffirm our 1987 disposition of this issue.

MOTION TO DISMISS THE INDICTMENT
Keen claims that the trial court erred in denying his motion to dismiss the indictment on the ground that it was based on perjured testimony. He argues that Patrick Keen testified to the grand jury that he, Michael Keen, had made inculpatory statements about this offense. Keen further contends that because Patrick Keen subsequently recanted this testimony under oath, and was convicted of perjury arising out of this testimony, any indictment based on his brother's initial, allegedly perjured testimony violates his due process rights. This claim is without merit.
Both parties properly cite Anderson v. State, 574 So.2d 87, 91 (Fla.1991), for the proposition that "due process is violated if a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony without informing the court, opposing counsel, and the grand jury." However, after reviewing Patrick Keen's grand jury testimony, his subsequent recantation in a sworn statement to assistant state attorney William Dimitrouleas, and the trial *281 judge's order denying Keen's motion to dismiss the indictment, we conclude that no due process violation occurred in presenting the indictment against Keen.
First, the State is undoubtedly correct that while Patrick Keen was convicted of perjury for giving inconsistent statements in an official proceeding, "[n]o evidence has ever been presented to prove which of the statements was perjured testimony, and no decision has ever been entered making such a finding." Appellee's Answer Brief at 51. Defense counsel did not dispute this assessment in the motion hearing on this issue, acknowledging that "we know one version is true and one version is false.... You have a fifty-fifty chance that the indictment was predicated upon perjury." Even taking those statements at face value, Keen did not suffer a due process violation as contemplated in Anderson.
Second, and most persuasively, the trial judge's order observes that each count of the seven-count information charging Patrick Keen with perjury in an official proceeding recites the same accusation that "on the 18th day of May, A.D., 1987 ... [Patrick Keen] did unlawfully and feloniously make a false statement while under oath in an official proceeding in regard to a material matter, to wit:...." Consequently, the trial judge ruled that Patrick Keen was "charged and convicted of perjury based upon the sworn statement in which he recanted his testimony, not the testimony itself, ergo this court cannot find that any portion of his [grand jury] testimony was false." (Emphasis added.) Clearly, this finding belies any claim Keen may have that his indictment was based on perjured testimony. It is also completely in accord with our caselaw. We recently reiterated that "[i]n assessing recanted testimony, we have stressed caution, noting that it may be unreliable and trial judges must `examine all of the circumstances in the case.'" Robinson v. State, 707 So.2d 688, 691 (Fla.1998) (quoting State v. Spaziano, 692 So.2d 174, 176 (Fla. 1997)). Here, the trial judge did precisely that.
Finally, the sequence of events supports the State's argument. Patrick Keen's grand jury testimony occurred on September 12, 1984. Keen was convicted of first-degree murder and sentenced to death in 1985. This Court reversed and remanded for a new trial on March 19, 1987. The opinion noted that Shapiro first gave his damning version of Keen's actions to detectives Amabile and Scheff in August 1984. Appended to that sentence was a footnote that stated, in part, "It appears that appellant's brother, Patrick Keen, contacted a representative of one of the companys [sic] who insured Anita Lopez Keen's life, offering to tell the `true' story of her death in exchange for a finder's fee. The representative then contacted the Broward County authorities who in turn contacted Shapiro." Keen, 504 So.2d at 398 n. 1. The opinion also stated that "the real jury issue presented in this trial centered on the credibility of Shapiro versus the credibility of Keen." Id. at 401.
Therefore, it appears more than coincidental that slightly less than two months later, on May 18, 1987, Patrick Keen made his statement to Dimitrouleas that he lied in front of the grand jury; that Keen told him his wife had too much to drink on the boat and "fell off the boat because the ladder [runs] right alongside the side of the boat"; that this version of events was the only story Keen provided as to Anita's disappearance; that Keen did not tell him he had to hurry up his plan before Anita gave birth; that Keen never told him that he married Anita for the explicit purpose of collecting insurance money after murdering her; and that detective Amabile told him what to say before the grand jury. For the reasons expressed above, we find no error in the trial judge's ruling on this issue.

CROSS-EXAMINATION ON DETECTIVES' INTERROGATION TACTICS
Keen's next claim of error is that the trial court improperly restricted his cross-examination *282 of detectives Amabile and Scheff regarding prior discipline for allegedly improper interrogation techniques in other cases. We find no merit in this claim.
At the outset, this claim appears to be an attempt to relitigate the issue in claim (9) regarding Keen's motion to suppress his statements made to police. The essence of Keen's argument is that the trial court erred in precluding him from "cross-examining Officers Amabile and Scheff about being disciplined for improper interrogation techniques in other cases ... [because] [t]he police conduct in this case was an important issue below." Appellant's Initial Brief at 56.
First, as noted in claim (9), this issue was fully litigated and determined in Keen's first direct appeal. Keen, 504 So.2d at 399-400. The "police conduct" in this case was closely examined and no improper activity was found. Therefore, the basic premise of Keen's argument has no factual basis.
Second, as a general rule, an appellate court "cannot speculate what any proffered testimony would have been in determining whether it was error not to allow it." Stokes v. State, 658 So.2d 1159, 1160 (Fla. 2d DCA 1995) (quoting Williams v. State, 600 So.2d 524, 525 (Fla. 2d DCA 1992)). Further, this Court has explained that reverse Williams-rule evidence "requires the same showing of relevance as evidence offered by the prosecution." Kimbrough v. State, 700 So.2d 634, 637 (Fla.1997); see also Ehrhardt, supra, § 404.9 at 180-81. That is, section 90.404(2)(a), Florida Statites (1995), applies without regard to whether the evidence is offered by the State or a criminal defendant. See id. at 180. The section provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
(Emphasis added.)
In this case, Keen proffered no facts sufficient to show relevance to a material fact in issue. Here, Keen's motion only stated that he wished to ask the detectives about "discipline they received for improper interrogation techniques in another homicide case." In ruling on the motion, the trial judge wrote:
As offered by the defendant in this motion, his request to cross-examine the officers based upon this collateral disciplinary matter is an attempt to introduce Reverse Williams Rule evidence. He is entitled to introduce such evidence subject to the same strict standards of relevancy as when it is offered by the state. Rivera v. State, 561 So.2d 536, 539 (Fla.1990); State v. Savino, 567 So.2d 892, 894 (Fla.1990). At present, the court agrees with the state that the defendant has failed to show the evidence is relevant to an issue in the case other than the bad character of the officers or their propensity to conduct themselves in a particular manner.
For the reasons stated above, we find no error in the trial court's ruling on this issue.

PENALTY PHASE-JURY OVERRIDE
The trial judge overrode the jury's life recommendation. Keen argues that this was error because there were several reasonable bases for the jury's recommendation. Although two juries previously recommended imposition of a death sentence, the very rigid standard established by this Court requires that we agree with Keen's position.
The appropriate standard in analyzing a jury override is well-known: "To sustain a jury override, this Court must conclude that the facts suggesting a sentence of death are `so clear and convincing *283 that virtually no reasonable person could differ.'" San Martin v. State, 717 So.2d 462, 471 (Fla.1998) (quoting Tedder v. State, 322 So.2d 908, 910 (Fla.1975)). "In other words, we must reverse the override if there is a reasonable basis in the record to support the jury's recommendation of life." San Martin, 717 So.2d at 471 (citations omitted). In that manner, the narrow inquiry to which we are bound honors the underlying principle that this jury's advisory sentence reflected the "conscience of the community" at the time of this trial. See Strausser v. State, 682 So.2d 539, 542 (Fla.1996); Dolinsky v. State, 576 So.2d 271, 274 (Fla.1991); Richardson v. State, 437 So.2d 1091, 1095 (Fla.1983).
The trial judge's sentencing order is thoughtful and well written; he obviously considered his decision in a very deliberative, serious manner. Reasonable arguments can certainly be presented to support his order. However, we find that the standards for weighing aggravators and mitigators in a death recommendation case have been transposed with those applicable to consideration of a jury recommendation of life imprisonment. The following passage from the sentencing order illustrates the trial judge's reasoning:
The Court finds the evidence in mitigation is minimal compared to the magnitude of the crime that has been committed by the defendant. In the final analysis, the mitigating circumstances found to exist have no relationship to the crime committed to such a degree that the jury could reasonably conclude life is a proper penalty.
Furthermore, the jury's decision during the guilt phase of this proceeding essentially disregards any theory that the death of Anita Keen was accidental. If the jury believed that the victim's death was the result of premeditated murder, then the cold and calculated plan to kill her must necessarily outweigh the mitigating circumstances presented by the defense. This Court can only conclude that the jury's hasty recommendation of life indicates that it was based on something other than the sound reasoned judgment required in such cases. Had the jury considered the aggravating and mitigating circumstances, the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. The mitigating evidence is wholly insufficient to outweigh the aggravating circumstances in support of a life sentence.

(Emphasis added.)
The last line emphasized above indicates that the wrong standard was ultimately applied in consideration of the jury's life recommendation.[17] The singular focus of a Tedder inquiry is whether there is "a reasonable basis in the record to support the jury's recommendation of life," San Martin, 717 So.2d at 471, rather than the weighing process which a judge conducts after a death recommendation. See Cheshire *284 v. State, 568 So.2d 908, 911 (Fla.1990) (reiterating that under Tedder, "the trial court's role is solely to determine whether the evidence in the record was sufficient to form a basis upon which reasonable jurors could rely in recommending life imprisonment") (emphasis added). In that vein, this case is similar to Esty v. State, 642 So.2d 1074 (Fla.1994). There, the trial judge overrode the jury's life recommendation,[18] reasoning that "unless resulting from sympathy, [it] could have been based only on minor, mitigating circumstances and was without any reasonable basis in the record." Id. at 1080. We reversed the override on appeal, finding that "[t]he record in this case reveals a number of factors that support the jury's recommendation, including Esty's age of eighteen at the time of the murder, his lack of a criminal history, his potential for rehabilitation, and the possibility that he acted in an emotional rage." Id.
Here, we reject the implicit determination that no reasonable juror could find that Shapiro's disparate treatment militated in favor of a life sentence for Keen. To begin, Keen notes that the trial judge cited Campbell v. State, 571 So.2d 415 (Fla.1990), a death recommendation case, for the proposition that "disparate treatment of an equally culpable accomplice is a nonstatutory mitigating factor which can serve as a basis for a jury's recommendation of life." He argues, and we agree, that this proposition of law was then used to erroneously narrow the definition of what a juror can reasonably consider as disparate treatment.[19] From that faulty premise, the conclusion was then reached that based upon the court's view of the facts, disparate treatment could not be a reasonable basis for a life recommendation because Shapiro was neither "a willing or equally culpable accomplice," citing Colina v. State, 634 So.2d 1077 (Fla.1994), another death recommendation case.
Consequently, the focus of the analysis was not upon finding support for the jury's recommendation, i.e., determining if a reasonable basis existed for the jury's decision, but rather toward proving that the jury got it wrong and lacked any reasonable basis to recommend life.[20] In other words, the trial judge disagreed with their recommendation based on his view of the mix of aggravators and mitigators, rather than through the prism of a Tedder analysis. This was error, because just as a Tedder inquiry has no place in a death recommendation case, see Franqui v. State, 699 So.2d 1312, 1327 (Fla.1997) (rejecting reliance on jury override cases in death recommendation case because such *285 cases "entail[ ] a wholly different legal principle and analysis"); Watts v. State, 593 So.2d 198, 204 (Fla.1992) (same), the reciprocal holds true when a jury life recommendation is independently analyzed by the trial court and independently reviewed by this Court.[21] In other words, the jury's life recommendation changes the analytical dynamic and magnifies the ultimate effect of mitigation on the defendant's sentence.
Keen also accurately interprets our reasoning in Brookings v. State, 495 So.2d 135, 143 (Fla.1986), as applying to a co-actor "guilty of the same offense rather than having the exact same degree of participation in the crime." Appellant's Initial Brief at 84. The facts in Brookings were as follows:
In November 1978, during a barroom fight in Tampa, Irwin Ballard allegedly stabbed several persons. One of those victims died. Earl Sadler witnessed this murder. Shortly thereafter, Ballard's mother, Mrs. Cecil Murray, claimed to have received threats against her family and property which she attributed to Sadler. In March 1980, Murray hired Brookings for $5,000 to kill Sadler in order to prevent Sadler from testifying against her son. On April 11, 1980 Brookings and his girlfriend, Judith Lowery, went to Sadler's home driving a car owned by Murray. Lowery testified at trial that she backed the car into Sadler's driveway and induced Sadler to come outside to help on the pretext that her car would not start. While Sadler was in front of the car (evidently inspecting the engine) Brookings shot Sadler dead. Lowery drove over the victim's body as they left the murder scene.
495 So.2d at 137. Lowery received total immunity in exchange for her truthful testimony against Brookings, while Mrs. Murray pled nolo contendere to second-degree murder in exchange for a life sentence and her truthful testimony against Brookings. See id. The jury convicted Brookings of first-degree murder and recommended a life sentence, which the trial judge overrode. See id.
In reversing the jury override in Brookings, we noted that although the defendant "pulled the trigger, Murray and Lowery were also principals in this contract murder, helping to plan and carry out this crime." Id. at 143. We then concluded that because "Murray would escape any chance of the death penalty and that Lowery would walk away totally free while the ultimate penalty was sought against appellant, [these] are facts that could reasonably be considered by the jury. Since reasonable people could differ as to the propriety of the death penalty in this case, the jury recommendation of life must stand." Id. (emphasis added). On numerous occasions, we have cited Brookings for this proposition of law in reversing jury overrides. See Caillier v. State, 523 So.2d 158, 160-61 (Fla.1988); Pentecost v. State, 545 So.2d 861, 863 (Fla.1989); Fuente v. State, 549 So.2d 652, 658-59 (Fla.1989); Barrett v. State, 649 So.2d 219, 223 (Fla. 1994). Moreover, we recently applied that same analysis in recognizing the disparate treatment of another principal in a crime as a reasonable basis for a life recommendation. See Pomeranz v. State, 703 So.2d *286 465, 472 (Fla.1997) (finding codefendant's life sentence a reasonable basis in case where defendant shot a store clerk during robbery while codefendant waited outside in car).
With Brookings and Pomeranz as starting points, and in full recognition that Keen was almost certainly the more blameworthy of the two principals, we cannot ignore the fact that Shapiro's participation was an essential element of the planned crime.[22] That is, without Shapiro, Keen's plan to push his wife overboard, allow her to drown, and recover her body as "evidence" of an accident for double indemnity purposes would have never proceeded to the ultimate act. Shapiro testified that the plan was that he would be a witness to Anita's "accidental" death to support Keen in his subsequent insurance claim. The jury could have also seized on Shapiro's admission that he drove the boat away from Anita after Keen pushed her into the water, thus directly injecting himself into the murderous episode and leaving Anita to her fate.
In addition, a reasonable juror could have thought that Shapiro had numerous opportunities to report Keen's plan to the police, but did not because he saw Keen's scheme as a way to absolve his own indebtedness. The end result was that Shapiro colluded with Keen's plan, Anita Keen died in the open sea, and Shapiro walked free and clear of criminal prosecution. Therefore, in light of these undisputed facts presented during the coperpetrator's own testimony, the decision to downplay the disparate treatment mitigating factor as having "no relationship to the crime committed" seems, at best, a very dubious proposition. Moreover, it ignores our well-settled definition of a mitigating factor as being proffered matters "relevant to the defendant's character or record, or to the circumstances of the offense." LeCroy v. Dugger, 727 So.2d 236, 242 (Fla.1998) (emphasis added); see also Johnson v. State, 660 So.2d 637, 646 (Fla.1995).
Shapiro's credibility problems could have also served to mitigate Keen's crime, as he was an admitted perjurer who had changed his version of events over time. We have previously found this to be a reasonable basis for a life recommendation. See Pomeranz, 703 So.2d at 472 (recognizing one reasonable basis as "the credibility problems of Kinser (the State's main witness against Pomeranz")) (emphasis added). Likewise, a reasonable jury could have believed that Keen evidenced a good potential for rehabilitation based on his largely productive life and good prison record.[23]See Esty; Cooper v. Dugger, 526 So.2d 900, 902 (Fla.1988); Fead v. State, 512 So.2d 176 (Fla.1987). Such a determination could only have been further bolstered by the fact that the State presented nothing to rebut the evidence that Keen had lived a successful, productive, and law-abiding life prior to Anita's murder.
In the final analysis, there are several reasonable bases upon which a reasonable juror could rely to support the life recommendation. While any of us might or might not have come to the same conclusion with regard to the imposition of a death sentence based upon the evidence presented in this case had we been jurors, that is not the legal standard by which we must evaluate the override of the jury's recommendation. To be sure, the "vast mitigation" found in other cases, see, e.g., *287 Strausser, 682 So.2d at 542, is not present here, but certainly enough mitigation exists upon which a reasonable juror could rely to warrant reversal under Tedder.[24]See, e.g., Pomeranz; Esty; Brookings. Thus, we find that the trial court erred in overriding the jury's life recommendation.
In conjunction with our reversal for a new trial on the hearsay claim, our reversal on this issue precludes the State from again seeking the death penalty against Keen for this crime. See generally Monge v. California, 524 U.S. 721, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998) (reaffirming Eighth Amendment prohibition against seeking death penalty on retrial where original sentencer imposed a life sentence). We so direct because "[w]hen it is determined on appeal that the trial court should have accepted a jury's recommendation of life imprisonment pursuant to Tedder, the defendant must be deemed acquitted of the death penalty for double jeopardy purposes." Barrett, 649 So.2d at 223; Wright v. State, 586 So.2d 1024, 1032 (Fla.1991). Consequently, if Keen is retried for Anita's murder, he may not again be subjected to the death penalty.

LIFE WITHOUT PAROLE AS SENTENCING OPTION
Finally, Keen claims that the trial court erred in not considering life without parole as a sentencing option. In Bates v. State, 750 So.2d 6 (Fla.1999), petition for cert. filed (U.S. May 8, 2000) (No. 99-9526), and Hudson v. State, 708 So.2d 256, 262 (Fla. 1998), we recently rejected a claim similar to that made by Keen in this case. As in Bates and Hudson, we reject Keen's claim here.

CONCLUSION
Based upon the foregoing reasoning, we reverse the first-degree murder conviction, vacate the sentence of death, and remand further proceedings consistent with this opinion.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
WELLS, C.J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
WELLS, C.J., concurring in part and dissenting in part.
I dissent as to the reversal of guilt. I conclude that the trial judge was within his discretion in denying the motion for mistrial. See Cole v. State, 701 So.2d 845, 853 (Fla.1997). The analysis in respect to this point is necessarily on the basis of abuse of discretion under Cole and not on the basis of harmless error under State v. DiGuilio, 491 So.2d 1129 (Fla.1986). The majority points to no error made by the trial court, which is plainly accurate since the only evidentiary objection made was sustained rather than denied. Without error, it must follow that there is no harmless error review. It is erroneous to mix motion for mistrial review and harmless error review because each requires a different analysis. Such mixing confuses the analysis of both.
Moreover, the question which elicited the information from the two insurance companies was not objected to and, if it had been, did not call for hearsay. The question was, "Why did you begin to investigate the case at that time?" The police investigation had been dormant for a couple of years. This question was as to notice and not to prove the matter asserted. *288 See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982); Pauline v. Lee, 147 So.2d 359 (Fla. 2d DCA 1962); 6 John Henry Wigmore, Evidence in Trials at Common Law § 1766 (Rev.ed.1976). This case is plainly distinguishable from Wilding v. State, 674 So.2d 114 (Fla.1996), in which there was an objection and in which hearsay was related.
I concur as to the setting aside of the death sentence on the basis of Tedder v. State, 322 So.2d 908 (Fla.1975).
QUINCE, J., concurs.
NOTES
[1] The same jury that sat for the guilt phase reconvened for the penalty phase.
[2] The trial court found the following statutory aggravators: (1) the murder was committed for pecuniary gain, section 921.141(5)(f); Florida Statutes (1995); (2) the murder was especially heinous, atrocious, or cruel (HAC), section 921.141(5)(h); and the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (CCP), section 921.141(5)(i). The trial court found no statutory mitigators. In nonstatutory mitigation, the trial court accorded the disparate treatment of the defendant's accomplice, Kenneth Shapiro, little weight; his good behavior since his 1984 arrest some weight; his good behavior at trial little weight; and his prior contributions to society and good employment record little weight. The trial court rejected two proffered nonstatutory mitigators, finding that they did not exist: the defendant's good character and positive personality traits, including his past history of unselfishness and generosity toward others; and his good potential for rehabilitation.
[3] Johnson was unavailable.
[4] This is the version that Keen testified to during his second trial, i.e., his first retrial. Keen, 639 So.2d at 598.
[5] Moran was facing an outstanding armed robbery charge in Florida at the time of his incarceration with Keen.
[6] The claims are: (1) the trial court erred in denying Keen's motion for mistrial after hearsay was introduced; (2) the trial court erred in denying Keen's motion for mistrial after a witness mentioned the prior trial; (3) the trial court erred in prohibiting Keen from placing in evidence a letter relevant to a witness's motive and inconsistent with his trial testimony; (4) the trial court erred in allowing a witness to identify a hand-printed note as Keen's; (5) the trial court erred in allowing a lay witness to express an opinion; (6) the trial court erred in allowing collateral offense and opinion evidence; (7) the trial court erred in giving a special jury instruction on jurisdiction; (8) the trial court erred in restricting cross-examination of a prosecution witness; (9) the trial court erred in denying Keen's motion to suppress his statements to police; (10) the trial court erred in denying Keen's motion to dismiss the indictment; (11) the trial court erred in prohibiting the cross-examination of the arresting officers regarding their interrogation techniques in other cases; (12) the state of Florida lacks jurisdiction to prosecute this homicide; (13) the trial court erred in denying Keen's motion to dismiss based on prosecutorial misconduct; (14) the standard jury instruction on reasonable doubt is unconstitutional; (15) the trial court erred in overriding the jury's life recommendation; (16) the trial court committed errors in its sentencing order; (17) the trial court erred in not considering life without parole as a sentencing option; (18) electrocution is cruel and unusual punishment; and (19) Florida's death penalty statute is unconstitutional.
[7] Claim (12) was fully litigated in Keen's first direct appeal and rejected by this Court. Keen, 504 So.2d at 398-99. The case that controlled our resolution of Keen's original claim, Lane v. State, 388 So.2d 1022 (Fla. 1980), not only remains good law, but was cited extensively and approvingly by this Court as recently as 1993. See Deaton v. Dugger, 635 So.2d 4 (Fla.1993). Likewise, claim (13) was considered and rejected in Keen's first direct appeal. Keen, 504 So.2d at 402 n. 5. Claim (14) has been consistently rejected by this Court. See Richardson v. State, 706 So.2d 1349, 1356 (Fla.1998); Archer v. State, 673 So.2d 17, 20 (Fla.1996). Claim (16) is moot in light of our resolution of the jury override issue. Claim (18) was rejected by this Court in Provenzano v. Moore, 744 So.2d 413 (Fla.1999); cert. denied, 528 U.S. 1182, 120 S.Ct. 1222, 145 L.Ed.2d 1122 (2000) and Jones v. State, 701 So.2d 76 (Fla. 1997). Finally, claim (19) has been consistently rejected by this Court. See Knight v. State, 746 So.2d 423, 429 n. 7 (Fla.1999); Richardson, 706 So.2d at 1356.
[8] At this point, defense counsel Kenneth Kukec registered a hearsay objection, which the trial judge sustained.
[9] At this juncture, a sidebar was held where the defense requested a mistrial, which was denied. Thereafter, the questioning resumed.
[10] State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
[11] Keen had filed a "presumption of death" action with the circuit court sometime in 1982 to support his claim on the insurance policies. As of the time of his arrest on August 23, 1984, the insurance companies still had refused to pay Keen under the policies, presumably as a result of insurance investigations.
[12] Czubak v. State, 570 So.2d 925 (Fla.1990).
[13] While the trial judge refused to admit the letter into evidence, he did allow it to be marked as court exhibit no. 4 for purposes of appellate review.
[14] We have reproduced the excerpt of the letter as written, leaving in the several grammatical, punctuation, and spelling errors.
[15] While Moran testified on cross-examination that he was not a witness against his codefendant in the Michigan case, Ted Scafey, the letter states that "I not only identified but caused the arrest and testified against the real killer." Again, while he did not associate the "real killer" with Scafey, Moran made clear later in his letter that he waited in the van while Scafey got out and conducted what turned out to be an armed robbery and murder. Moran wrote that, "Ted returned about seven minutes later and as he entered the van he said, quote, `did you hear that cap go off. I [Moran] said what the f___ are you talking about and Ted said I just had to waste a dude but at least I have more money now than I did before I went in the joint.'"
[16] Ironically, Keen notes this fact in his brief. Appellant's Initial Brief at 41. In so doing, he undercuts his argument in claim (3) regarding Moran's motive for testifying in this case.
[17] As the judge's own order indicates, the jury was able to reasonably sort out the facts and apply the law in convicting Keen of first-degree murder. Consequently, "[t]here is no reason to believe that the same jury was less capable of reasonably applying the aggravating and mitigating circumstances in the penalty phase of the trial." See Parker v. State, 643 So.2d 1032, 1035 (Fla.1994). Here, the State presented no penalty phase evidence and Keen only briefly offered his mother's statement and prison behavior record as nonstatutory mitigation. Further, what was probably the paramount nonstatutory mitigator, Shapiro's disparate treatment, had already been presented, in effect, during defense counsel's exhaustive cross-examination during the guilt phase and such cannot be overlooked in this analysis.

Finally, even if the comment about the jury's "hasty" life recommendation had some merit, that reasoning could have just as equally applied to the five jurors who "hast[il]y" recommended death. Instead, it appears that some compelling reason convinced seven jurors that life was the appropriate sentence. The disparate treatment of Shapiro certainly could have been that reason. Indeed, it immediately springs to mind considering that Shapiro's testimony is, at bottom, the only tangible evidence of Keen's guilt.
[18] The trial judge found two aggravators, HAC and CCP; one statutory mitigator, no significant history of prior criminal activity; and no nonstatutory mitigators. Id. at 1076.
[19] On the issue of disparate treatment, a fundamental distinction exists between a defendant who receives an advisory sentence of death from a jury as opposed to one who receives an advisory sentence of life. In the former, the defendant is left to argue that the jury got it wrong and that the disparate treatment of a codefendant or coperpetrator should have mitigated the offense. In the latter situation, such as here, it must be assumed that the jury found that disparate treatment mitigates the offense. That is, a majority of a twelve-person jury concluded that based on the record before them, this factor compelled a life recommendation, whether alone or in combination with other mitigation. From that starting point, the trial court must then consider whether disparate treatment could serve as a reasonable basis for a life recommendation.

Here, that is an especially powerful finding because the same jury found sufficient evidence to convict the defendant of first-degree murder. Thus, the jury was apparently able to follow the law and apply the appropriate legal standards to the distinct phases of the capital case before them.
[20] Indeed, the second page of the sentencing order contains details of the aggravators, the mitigators, and supporting evidence as in a death recommendation case. It was not until the twelfth page of the sentencing order that Tedder is mentioned, which is the appropriate standard that should have guided the inquiry from the outset. In short, the analysis was conducted backwards. See Porter v. State, 723 So.2d 191, 198 (Fla.1998).
[21] As we unambiguously stated several years ago:

Under Florida law, the role of the jury is one of great importance, and this is no less true in the penalty phase of a capital trial. Tedder. Juries are at the very core of our Anglo-American system of justice, which brings the citizens themselves into the decision-making process. We choose juries to serve as democratic representatives of the community, expressing the community's will regarding the penalty to be imposed. A judge cannot ignore this expression of the public will except under the Tedder standard adopted in 1975 and consistently reaffirmed since then.
Stevens v. State, 613 So.2d 402, 403 (Fla. 1992); see also Parker, 643 So.2d at 1035 (repeating the admonition that "[a]lthough we have made it clear many times before, we wish to leave no doubt that Tedder is indeed the law of this State, law that this Court has applied scores of times since 1975 `and consistently reaffirmed since then'").
[22] Indeed, Shapiro testified that Keen told him to meet Keen and his wife at Tug Boat Annie's, so he could join them on their sea voyage and serve as a witness to Anita's "accident" for double indemnity purposes. Shapiro related that the encounter would be a "chance" meeting because Keen was not sure that Anita would go sailing if she knew someone would accompany them.
[23] The evidence showed that Keen's prison record was good except for the minor disciplinary infraction where it was found that Keen possessed a misdemeanor amount of marijuana.
[24] Moreover, so there is no doubt as to the proper focus of a life recommendation analysis, reversal under Tedder is in no way prevented even assuming the presence of several valid aggravators. Indeed, that has been the rule rather than the exception. See Johnson v. Dugger, 911 F.2d 440, 474 n. 78 (11th Cir.1990) (listing 47 cases reversed by this Court under Tedder between 1975 and 1989 where between one to five valid aggravating factors existed or were assumed to exist), vacated on other grounds, 920 F.2d 721 (11th Cir.1990); Fuente, 549 So.2d at 658-59 (recognizing propriety of jury override reversal in Brookings despite presence of four "valid" aggravators).