816 So.2d 554 (2002)
Rolando GARCIA, Appellant,
v.
STATE of Florida, Appellee.
No. SC95136.
Supreme Court of Florida.
April 18, 2002.
*557 Bennett H. Brummer, Public Defender, and Christina A. Spaulding, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Kimberly Nolen Hopkins, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court imposing the death penalty upon Rolando Garcia for the murders of Mario Amador and Roberto Alfonso. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons discussed in this opinion, we reverse Garcia's convictions and the death sentences imposed, and we remand this case for a new trial consistent with this opinion.

PROCEDURAL BACKGROUND
Garcia was initially charged in a multicount indictment arising out of four episodes of double murders that occurred in Dade County in 1986.[1] Manuel Pardo, Jr. also was charged in the indictment.[2] Pardo, a former police officer, subsequently went to trial and admitted he intentionally killed the victims, but also testified that Garcia had no involvement in the murders.[3]
Garcia later went to trial on six of the homicides.[4] He was acquitted of the murders of two of the six homicide victims (Luis Robledo and Ulipano Ledo) and convicted of the murders of four victims arising from two episodes of double murder (Mario Amador and Robert Alfonso; and Ramon Alvaro and Daisy Ricard). On direct appeal, this Court reversed all of the convictions and death sentences, concluding that the six homicides and related charges had been improperly joined for trial because
each pair of homicides and related offenses tried in this case involved different victims at different dates and in different places stretching across a three-month period. The first pair of murders occurred about five weeks before the second, and the second pair of murders occurred two months before the final murders. There was no temporal or geographical connection to link these crimes in an episodic sense. The only clear similarity is that they were similar types of offenses and allegedly they were committed by the same two people, either for money, drugs, or both. *558 Garcia v. State, 568 So.2d 896, 899 (Fla. 1990). The Court directed that Garcia be retried separately for the murders of Amador and Alfonso, which arose out of one episode, and the murders of Alvaro and Ricard, which arose out of a separate episode. See id. at 901 n. 14.
Since this Court's remand, Garcia has been tried and acquitted of all charges in the Alvero and Ricard case, as well as in the Millot case.[5] This appeal arises out of Garcia's retrial and convictions for the murders of Amador and Alfonso.

FACTUAL BACKGROUND GUILT PHASE
On January 22, 1986, Amador and Alfonso were found face down in Amador's apartment. They had been killed by multiple gunshot wounds to the head and neck, and Amador also had been shot once in the hip. A portable scale was found on the dining room table and traces of an unidentified white powder were found outside the front door. There were no signs of forced entry or ransacking; in fact, the apartment was described as "immaculate." No murder weapon was ever found. In May 1986, Carlos Ribera contacted the Hialeah Police Department and, based upon information he provided, Pardo and Garcia were arrested.
Ribera was the State's key witness at trial and he testified in detail about what Garcia had allegedly told him about the murders of Amador and Alfonso. Ribera testified that he first met Garcia in December 1985 at the video store where Ribera worked, and in January 1986, he started driving Garcia around.
Ribera testified that some time in March 1986, Garcia called Ribera and told him that Garcia's uncle, "the federal agent," wanted to see Ribera. When Ribera went to pick Garcia up, Garcia showed him some newspaper articles. Garcia told Ribera that the articles "were about a guy named Mario that he had setup with a drug deal and that [Garcia and Pardo] ripped him off and that they killed him and that was all."
Ribera also testified that when they went to Pardo's apartment, Garcia told Ribera the following story: what had occurred was a "drug rip off." Garcia and Pardo had gone to Amador's apartment in the late evening to buy two kilograms of cocaine. They knocked on Amador's door and Amador answered. They went in and Amador guided them to the kitchen, where they sat down. Amador looked happy because he thought there was money in Pardo's briefcase. Amador went into another room and got the drugs and brought them back. Ribera further testified that Pardo, who was present while Garcia allegedly related these events, stated, "Yea, that is when I opened the briefcase and I took out my gun."
Ribera stated that Pardo took out his .22 Rugar and that Garcia also had a .22 Rugar. Garcia then showed Ribera the .22 Rugar, which was on the dresser, and he showed him how the silencer would clip on to the gun. Garcia told Ribera that he and Pardo put Amador and Alfonso on the floor and shot them. Garcia told Ribera that he was "a hit man" and "a drug dealer."
Ribera testified that his relationship with Garcia changed in late April and early May. Garcia was upset because his drug supplier had found out that he killed Amador, and therefore the supplier did not want to deal with him anymore. Ribera testified that Garcia then threatened Ribera, and that is when Ribera went to the police.
*559 Garcia has always maintained his innocence. One of his theories of defense was that Ribera, along with Pardo, had committed the murders in question. For example, on the State's direct examination of Ribera, he testified that Garcia showed him a driver's license that Garcia identified as Amador's and that Garcia and Pardo had used it to buy some guns. However, on cross-examination of Ribera, defense counsel pointed out that the fictitious address used on the paperwork to purchase firearms in which Amador's driver's license was used was very close to Ribera's childhood address.
In addition to Ribera's testimony, the State also called certain witnesses who testified to Amador's mistrust of Garcia. John Hegarty, Sr. testified that he worked with Amador on a construction site and also had bought cocaine from him. Hegarty testified that Amador told Hegarty that Garcia had called Amador and wanted to make a deal with him for a kilogram of cocaine. Hegarty stated that he told Amador to be careful because he did not trust Garcia and that he might get ripped off by him. Hegarty also told Amador to make sure that he got "help or back-up."
Allen Lopez, another of Amador's co-workers, also testified at trial. Lopez testified that Amador told Lopez that a person named "Rolly" (Garcia's nickname) had been to his house to buy a kilogram of cocaine. According to Lopez, Amador stated that he wanted Lopez at his house because he did not want to be there alone due to the fact that he did not trust Garcia.
Garcia attempted to introduce Pardo's sworn testimony from Pardo's own trial in which Pardo confessed to the murders, and explicitly denied that Garcia was involved in any of the murders. However, the trial court found that the testimony was inadmissible under the exception to the hearsay rule governing prior testimony.
Garcia did not present any witnesses, nor did he testify himself. The jury returned a verdict of guilty on both counts of first-degree murder, robbery with a firearm, and unlawful possession of a firearm while engaged in a criminal offense.

PENALTY PHASE
At the beginning of the penalty phase, defense counsel explained to the trial court that Garcia did not want counsel to contest the aggravation, present any mitigation, submit jury instructions, cross-examine the witnesses, or make any arguments on his behalf. In explaining to the trial court his decision not to present mitigation, Garcia stated:
I told them that I didn't want anything to be brought forward in front of the jury regarding the penalty phase in my case and I asked my family not to be present in the courtroom so nobody could force them to beg for their son's life when I didn't commit the crime.
Defense counsel asked the court to reconsider the introduction of Pardo's testimony from his own trial because hearsay is admissible in the penalty phase and because it would exonerate Garcia or lessen his involvement. The court denied the request.[6]
*560 Ribera again testified at the penalty phase and said that Garcia told him that when the victims were on the floor face down and Pardo was getting the drugs, one of the victims said, "Please don't kill me, it is not worth it, just take the drugs, it is not worth it." Ribera testified that Garcia told Ribera that he starting laughing and "that he told these guys to just shut up and nothing was going to happen to them and that was all." Ribera also stated that Garcia told Ribera that he and Pardo "had planned it, it was his deal and that it was planned to go in there and take the drugs and kill them because they didn't want these guys to come back at them to kill them."
Garcia did not put on any mitigation, but was permitted at his request to address the jury. His statement, in which he again maintained his innocence, is as follows:
Good morning. First of all, I would like to thank you for your effort and consideration in this case even though you found me guilty and I am not. Number two, although you found me guilty, I would like to say that I need for your recommendation to be death because it is the only way that a proper Court will hear what you weren't allowed to hear in this case. And number four, I would like to thank my attorneys for the hell of a job that they did for me in trying to fight for my life. That is it.
The jury recommended death by a vote of ten-to-two for the murder of Amador and seven-to-five for the murder of Alfonso, and the trial court sentenced Garcia to death on both counts.[7] On appeal, Garcia raises six issues regarding the guilt phase of the trial[8] and four issues regarding the penalty phase of the trial.[9]

RIBERA'S PRIOR STATEMENTS
Garcia first contends that the trial court erred by failing to allow him to impeach Ribera with Ribera's prior inconsistent *561 statements. At trial, defense counsel attempted to impeach Ribera with statements that he made in an eight-hour videotaped interview with the Hialeah Police Department that occurred in May 1986. Defense counsel asserted that the videotaped statements contained material inconsistencies with Ribera's trial testimony.[10]
The trial court precluded any use of the videotaped statements because they: (1) were taken in preparation and in the course of a polygraph examination; (2) were not made under oath; and (3) did not specifically concern Ribera's factual account of the Amador and Alfonso homicides. We conclude that the trial court's failure to permit the use of the videotaped statements as impeachment was error.
At trial, the major point of contention between the parties on this issue was whether Ribera's videotaped statements were admissible because the statements were made preparatory to the administration of a polygraph examination. On appeal, however, the State does not attempt to defend the trial court's ruling on that basis. Indeed, a statement is not inadmissible solely because it is given before a polygraph examination. Cf. Johnson v. State, 660 So.2d 637, 642 (Fla.1995) ("As a general rule, the fact that a polygraph examination or the prospect of receiving one has preceded or accompanied a confession does not of itself render the confession inadmissible. Rather, there must be a sufficient showing of physical or psychological coercion, intentional deception, or a violation of a constitutional right.") (citation omitted). Thus, the trial court erred as a matter of law when it refused to permit Garcia to impeach Ribera because the statements were taken in preparation and in the course of a polygraph examination.
Likewise, the trial court erred as a matter of law when it refused to permit the impeachment because the statements were not made under oath. Indeed, there is no requirement that a statement be made under oath in order for it to constitute impeachment evidence. See Charles W. Ehrhardt, Florida Evidence § 608.4, at 456 (2001 ed.).
On appeal, the State's major contention is that the videotaped statements did not constitute proper impeachment because the statements did not specifically concern Ribera's factual account of the Amador and Alfonso murders. The State also argues in the alternative that the omission of the impeachment was harmless error because Ribera was impeached with other statements.
Both the United States and Florida constitutions provide that a defendant has the right to confront adverse witnesses. See U.S. Const. amend. VI; art. I, § 16(a), Fla. Const. The right of cross-examination is "implicit in the constitutional right of confrontation and helps assure the `accuracy of the truth-determining process.'" Conner v. State, 748 So.2d 950, 955 (Fla.1999) (quoting Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Cross-examination is the "principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Thus, the question in this case is whether the trial court impermissibly *562 limited Garcia's cross-examination right and, if so, whether the limitation was harmless beyond a reasonable doubt.
We first address whether any part of the videotaped statements would constitute proper impeachment. Garcia contends that the first area of significant impeachment would be to contradict the image Ribera presented at trial as a dutiful family man who associated with Garcia and Pardo only in the hope that they would help him out of financial distress by including him in a drug deal. In particular, Ribera testified at trial that he was never involved in any drug deals and that he wanted to be involved in a drug deal with Garcia and Pardo "[b]ecause of the money, the cash, the money that I saw how they dressed, the life style at that time." In addition, at trial Ribera denied knowing or speaking to Sergio Godoy, except as a customer at the video store where he worked.
In contrast, in the videotaped statements, Ribera stated that the financially distressed Garcia and Pardo asked Ribera for help in the drug business. Ribera explained in the videotaped statements that Godoy asked Ribera to help both Garcia and Pardo because they were desperate for money and that Garcia personally appealed to Ribera for help. Ribera also stated that Garcia's money problems were so severe that he was about to lose his trailer, and so he was trying to get a job from Ribera at the video store. Additionally, Ribera claimed that he loaned Garcia $1000 to fix steps for his mother. We agree with Garcia that these statements are in stark contrast to the relationship portrayed by Ribera at trial and that they had the potential for constituting powerful impeachment as to the nature of the relationship between Garcia and Ribera.
Related to the inconsistencies in the portrayal of the relationship between Ribera and Garcia was the picture Ribera painted of his relationship with Pardo and Pardo's family. At trial, Ribera denied that he was close to Pardo and he stated that he had not spoken to Pardo until March 1986 (two months after the murders that occurred in this case). At trial, Ribera testified to only one brief interaction with Pardo's wife and daughter. Yet on videotape, Ribera stated that he had gone horseback riding with Pardo's family and that Pardo's seven-year-old daughter "knows how to use an Uzi." He also stated that Pardo's wife "murders people also."
A third and substantial area of claimed impeachment was the reason Ribera testified that he first went to the police. Ribera testified at trial that he went to the police because "Rolando Garcia came to my house and told me he would kill my family and kill me." In contrast, in the videotaped statements Ribera told the police that no one threatened him and he denied that he came to the police because he was afraid of Garcia and Pardo. He also denied that Pardo and Garcia made him nervous because of the activities in which they were involved, claiming that he did not know much about them anyway. These inconsistencies also could cast serious doubt on Ribera's credibility as to his trial statements that Garcia threatened to kill him if he went to the police and his fear of Garcia.
A last area of claimed impeachment was with regard to the level of knowledge about the details of the murders to which Ribera testified at trial. In over eight hours of videotaped statements in 1986, Ribera's only reference to these murders were that "they" told him to "read this article and that they killed two people in Fountainblue" and that he knew of the murder of "this guy Mario." This stands in marked contrast to the detailed testimony *563 at trial regarding what Garcia told him about the murders.
The State contends that the videotaped interview did not focus on the Amador and Alfonso murders and that the lack of detail is not proper impeachment. We disagree. Although the videotaped statements did primarily focus on three other murders, this was not the sole focus of the eight-hour interview. In fact, Ribera testified at trial that when he went to the police in May 1986, Ribera told the police what Garcia and Pardo had told him about the murder of "Mario." Ribera also testified at trial that he "always told the police the truth and [he] told them everything."
Any lack of detail about these two murders in Ribera's videotaped statements was material and may constitute permissible impeachment under these circumstances. See Sanjurjo v. State, 736 So.2d 1263, 1264 (Fla. 4th DCA 1999) (impeaching a witness with a prior statement includes allowing "witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.") (quoting State v. Smith, 573 So.2d 306, 313 (Fla.1990)); see also Davis v. State, 756 So.2d 205, 207 (Fla. 4th DCA 2000) (citing Sanjurjo and holding that the defendant was permitted to impeach the witness with prior, material omissions from her statement to police). Similarly, we conclude that the statements regarding the image Ribera presented of himself, the nature of Ribera's relationship with Pardo, and the reason why Pardo went to the police would have been relevant and important impeachment evidence.
Therefore, we hold that in light of the impeachment value of the videotaped statements, the exclusion of these statements impermissibly limited Garcia's right to cross-examine the key witness against him. Moreover, any error in the exclusion of the impeachment evidence was compounded when during closing argument the State told the jury why they should believe Ribera:
But you heard nothing in the testimony of Carlos Ribera to suggest that he sat in that chair and answered each and every question that was asked of him, either because he has been paid off or he had been threatened or he thinks that he will be threatened or he thinks that something will happen to him. That is pure speculation. The defense in this case had every opportunity to develop anything that they thought would be of use to them in their case. And that is part of our amazing system. That the defendant has a chance to sit in the courtroom with his accusers and the defense attorney has the chance to ask whatever the Court says is appropriate area for cross-examination. And nothing in this case developed that Carlos Ribera was lying, that Carlos Ribera received any benefit for coming into court or that he sat there and made up things against this defendant, because for some reason he was protecting himself in the future.
(Emphasis supplied.)
The exclusion of this relevant impeachment cannot be considered harmless beyond a reasonable doubt. No physical evidence linking Garcia to the murder scene and little physical evidence linked Garcia to the murders. Undoubtedly, Ribera was the lynchpin of the State's case and his credibility was critical to the strength of the State's case. If the jury did not believe Ribera's testimony about what Garcia allegedly told him, this alone could have been sufficient to create reasonable doubt. Therefore, reversible error occurred when the defense was deprived of the right to use any portion of the videotaped statements to impeach Ribera.

*564 FAILURE TO ADMIT PARDO'S FORMER TESTIMONY IN BOTH GUILT AND PENALTY PHASE
We next address Garcia's claim that the trial court erred in excluding the prior sworn testimony of Pardo in both the guilt and the penalty phase. Before Garcia's trial, Pardo invoked his Fifth Amendment rights and stated that he would not testify at Garcia's trial. In the guilt phase of Garcia's trial, the trial court did not permit Garcia to introduce Pardo's testimony from Pardo's prior trial[11] in which Pardo took the stand against the advice of his attorney. At that trial, Pardo testified that he alone committed the murders and he specifically testified that Garcia was not involved with the murders. In particular, Pardo stated:
Q: What about Rolando Garcia?
A: Rolando Garcia is related to my wife. I've known him since I've been married, 12 years. Rolando Garcia lived at my brother-in-law's house, my house. He had nowhere to go. We took him in. He was a run around boy, always been a run around boy for everybody else because he might have an IQ of two, but he's a good person, he's a good person.
Q: Did he have anything to do with any of these murders?
A: He would have gone crazy if he had anything to do with any of these murders. This is the job of a soldier, which is what I am. This is my mission.
Q: Why did you save these articles that are incriminatory, but underline them and keep them in your house?
A: I was proud of what I was doing. That was my mission in life .... I cut them out, I highlighted them and I put them in plastics. I wanted people to know what I had done and what I had contributed for your children and my children.
Garcia urges that Pardo's former sworn testimony was admissible under section 90.804(2)(a), Florida Statutes (1997), which provides an exception to the hearsay rule, when the declarant is unavailable, for:
(a) Former testimony.Testimony given as a witness at another hearing of the same or a different proceeding ... if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
The trial court denied the admission of the evidence. However, after reviewing the recorded sworn testimony from the prior trial, we conclude that the trial court abused its discretion in excluding the evidence.[12]
Because Garcia was not tried with Pardo, the State did not have the identical motive in cross-examining Pardo as it would have had if the State tried Pardo and Garcia together. Nonetheless, section 90.804(2)(a) does not require an identical motive but only a "similar motive".
In this case, the State's cross-examination of Pardo at his own trial reveals that the State had substantial doubts about the credibility and reliability of Pardo's testimony, including the testimony about Garcia's *565 lack of involvement, and that the State subjected Pardo to rigorous cross-examination on these subjects. Thus, the State had a similar motive in cross-examining Pardo, which was to discredit Pardo's testimony and show it to be not worthy of belief.
For example, during the State's cross-examination of Pardo, the following colloquy ensued:
Q: Rolando Garcia wasn't with you?
A: He wasn't in any murder.
Q: Rolando Garcia wasn't holding the second gun as you were holding the first gun?
A: No.
Q: And you each would shoot
A: You know that's not true.
Q: And you each would shoot the second victim and cross fire on both of them?
A: Rolando Garcia, the only time Rolando Garcia found out what I was doing, the last murder, if that's what you want to call it, when I had to call Rolando Garcia I had no choice.
When I shot the two women in the apartment, the gun got jammed on me. After I had shot the lady in the chest, she fell down, if you want to call her a lady, she fell down, the gun got jammed. That's why I struck her over the head with the gun and silencer assembly. When I finished shooting her
Q: Did you tell us that was the first time Rolando Garcia took your bloody car to get it covered?
A: Rolando Garcia was living in my house. I told him to take it to De Colores to have it reupholstered. He said what happened here. I said, "What, you writing a book?" He left it at that. He respects me a lot, always admired me. He don't really question too many things. I don't go bragging too much to Rolando Garcia because he's not wrapped too tight.
Importantly, the State also cross-examined Pardo about his relationship to Ribera, revealing that Ribera's knowledge about the crime may have come from what Pardo told him and the possibility that the statements Ribera attributed to Garcia were a fabrication by Ribera:
Q: Just bragged a lot to Carlo Ribera?
A: He's more beneficial than Rolando Garcia.
Q: You'll brag to Carlo while you won't to Rolando?
A: I told Rolly certain things, but not about the killings, no.
Thus, in this case the State had the opportunity to and did in fact cross-examine Pardo on the reliability and credibility of his version of the events. Accordingly, the State had a similar motive that fulfills the purpose of the former testimony hearsay exception.
Moreover, the failure to allow the jury to hear this testimony deprived the jury of important additional evidence that could have been critical to assessing Garcia's guilt. Indeed, where Garcia's alleged involvement in the crimes hangs on the testimony of one individualRiberathe jury was entitled to consider the testimony of the codefendant Pardo, who took the stand in his own trial and specifically testified that Garcia was not involved in these murders. In this case, to prevent the jury from hearing the prior recorded testimony of Pardo, which the State subjected to cross-examination, is to apply the hearsay rule "mechanistically to defeat the ends of justice." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). For all these reasons, the exclusion of Pardo's prior sworn testimony constituted error, which, like the limitation *566 on the cross-examination of Ribera, was not harmless beyond a reasonable doubt.
Additionally, Pardo's testimony would have been independently admissible during the penalty phase, in which Garcia again attempted to introduce Pardo's testimony from Pardo's own trial in which he exonerated Garcia. The trial court again denied that request, apparently for the same reasons it denied Garcia's request in the guilt phase. We conclude that the trial court also erred in excluding Pardo's testimony from the penalty phase.
Different considerations govern the presentation of evidence in the penalty phase of a death case. In Green v. Georgia, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the U.S. Supreme Court held that the exclusion of exculpatory hearsay evidence denied the defendant a fair trial as to punishment. In Green, the defendant and codefendant were indicted together, tried separately, and both were sentenced to death. See id. at 95, 99 S.Ct. 2150. During the penalty phase, the defendant attempted to introduce the testimony of a witness who had testified at the codefendant's trial. See id. at 96, 99 S.Ct. 2150. According to the witness, the codefendant had confided that he had killed the victim after ordering the defendant to run an errand. See id. The trial court refused to allow introduction of this evidence, finding that the witness's testimony constituted hearsay that was inadmissible under Georgia law. See id. On review, the Supreme Court ruled:
Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, see Lockett v. Ohio, 438 U.S. 586, 604-605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); id., at 613-616, 98 S.Ct. 2954 (opinion of BLACKMUN, J.), and substantial reasons existed to assume its reliability. Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it. In these unique circumstances, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Because the exclusion of Pasby's testimony denied petitioner a fair trial on the issue of punishment, the sentence is vacated and the case is remanded for further proceedings not inconsistent with this opinion.
Id. at 97, 99 S.Ct. 2150 (footnotes omitted).
In addition to Green, which is based upon due process considerations, section 921.141(1), Florida Statutes (1997), provides:
[E]vidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. *567 This Court has explained that "[t]his rule applies to the State as well" as to defendants. Blackwood v. State, 777 So.2d 399, 411-12 (Fla.2000). Thus, the fact that the trial court denied the admission of this evidence simply because it constituted hearsay was erroneous. Garcia could have used Pardo's testimony to show his minor participation, section 921.141(6)(d), Florida Statutes, or that he was acting under the substantial domination of Pardo, section 921.141(6)(e), Florida Statutes, or both.
Accordingly, the question presented here is whether the State was "accorded a fair opportunity to rebut any hearsay statement." This Court discussed this issue in Lawrence v. State, 691 So.2d 1068, 1073 (Fla.1997):
On the basis of the record, we cannot conclude that Lawrence did not have a fair opportunity to rebut Gardner's testimony. Defense counsel cross-examined Gardner at the original trial. Lawrence could have offered the cross-examination during the instant sentencing proceeding but did not. Nor did he proffer any other rebuttal to the trial court. We therefore reject Lawrence's contention that the admission of Gardner's testimony requires that his death sentence be vacated.
We conclude that the State in this case, like the defendant in Lawrence, had a "fair opportunity to rebut" the issue of Garcia's involvement and whether Garcia was less involved than Pardo. For example, the State had the opportunity to rebut and did rebut any claim that Garcia's involvement was minor with the testimony of Ribera. The State also cross-examined Pardo at his original trial. Under all these circumstances, Pardo's testimony was improperly excluded during the penalty phase, and the jury should have had a chance to hear Pardo's testimony in which he denied that Garcia was involved in these murders.

HEARSAY STATEMENTS OF LOPEZ AND HEGARTY
In addition to the erroneous limitation of cross-examination of the key State witness and error in excluding the prior testimony of Pardo in the guilt and penalty phases, we also agree with Garcia's claim that the trial court erred by admitting hearsay statements against him during the guilt phase. Part of the State's case against Garcia included placing in evidence that one of the victims, Amador, was distrustful of Garcia.
The jury heard this evidence through the hearsay testimony given by Allen Lopez as to what Amador had previously stated, thus leaving Garcia unable to cross-examine the declarant. During the State's direct examination of Lopez, over defense objection, the trial court allowed the following colloquy:
Q: Mr. Lopez, what did Mr. Amador tell you ...?
A: Somebody had been at his house with cash to buy a kilo of cocaine.
Q: Did he tell you who?
A: Yes.
Q: What name did he use?
A: Rolly.
Q: Did you know this person yourself Rolly?
A: No.
Q: And what did Mr. Amador tell you?
A: He wanted me to be there with him because he didn't want to do the deal by himself.
Q: Did he say why?
A: He didn't trust him.
Q: Did you show up to help him with that deal?
A: No.
Q: Did Mr. Amador say what happened to that deal?

*568 A: He didn't want to do it by him himself and it had been scheduled to be done another time.
It appears from the record that the trial court allowed these statements into evidence based on the statement against interest exception to the hearsay rule, section 90.804(2)(c), Florida Statutes, which provides:
(c) Statement against interest.A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
However, there is nothing about the statement regarding Amador's mistrust of Garcia that was against Amador's penal or proprietary interest. Moreover, "a homicide victim's state of mind prior to the fatal event generally is neither at issue nor probative of any material issue raised in the murder prosecution." Woods v. State, 733 So.2d 980, 987 (Fla.1999). Further as we stated in Stoll v. State, 762 So.2d 870, 874 (Fla.2000), "[l]ikewise, a victim's statements cannot be used to prove the defendant's state of mind." See also Downs v. State, 574 So.2d 1095, 1098 (Fla.1991). Accordingly, Lopez's statements did not fall within this exception to the hearsay rule, nor did they fall within any other exception. Therefore, the trial court abused its discretion in admitting the testimony of Lopez concerning Amador's statements that he was mistrustful of Garcia and did not want to be with him by himself.
Additional error occurred during the direct examination of John Hegarty. Hegarty testified that he warned Amador not to deal with Garcia "[b]ecause personally I just didn't trust him and I figured he was going to get ripped off by him." Hegarty stated, "I called him [Amador] up and I told him to beware of Rolly and the deal with the white horse and that-because he told me he was making a deal with Rolly that week. And I told him that night, and I said make sure you get help or backup or whatever." Hegarty also testified that after Amador was killed, Lopez "came out to the yard and he talked to me and he says, `Rolando killed Mario.'" In reply, Hegarty said, "I made a response and I saidI cussed a little bit and everything and I said, `Well, I warned him, I warned him.'"
The conversations between Hegarty and Amador also constituted inadmissible hearsay that does not fall within any hearsay exception. Moreover, the testimony of Hegarty that he did not trust Garcia was not relevant or material to any issue in the murder prosecution. The only possible purpose of this testimony was to prove that Garcia acted in conformity with Hegarty's impression that he distrusted Garcia and warned Amador to be aware of him. This evidence, in addition to being impermissible hearsay, amounts to no more than improper bad character evidence. See Martinez v. State, 761 So.2d 1074, 1082 (Fla.2000). We thus conclude that the trial court erred in admitting this testimony.

JURY OVERRIDE IN FIRST TRIAL
Finally, Garcia urges that we should address an issue that was raised but never resolved in Garcia's first appeal a claimed improper override of the *569 prior jury's life recommendation for the murder of Amador. Garcia argues that the Court must review the override of the previous jury's life recommendation for the Amador murder. Garcia asserts that because in his original trial in 1988 the trial judge erred in overriding the jury's recommendation of life for Garcia's murder of Amador based on Tedder v. State, 322 So.2d 908 (Fla.1975), we should determine that the defendant was acquitted of the death penalty and that the State was therefore barred from seeking the death penalty a second time. The problem with raising this argument at this time is the procedural posture in which Garcia raises this issue.
Garcia raised this issue in the original direct appeal. However, when we reversed the convictions based on the trial court's improper joinder of offenses and remanded for a new trial, we stated that because the improper joinder issue "disposes of this case, we do not address any of Garcia's other arguments presented on appeal." Garcia, 568 So.2d at 901. Clearly, we had the authority to address the jury override issue even though we were reversing the convictions on another ground. See Keen v. State, 775 So.2d 263, 287 (Fla.2000). However, on direct appeal in Garcia, the Court expressly did not address the jury override issue, and thus neither rejected nor approved of the jury override.[13] Thus, it would not constitute the law of the case because the issue was expressly not decided by this Court.
However, we decline to address the issue in this direct appeal because Garcia has abandoned this claim. Garcia did not challenge our decision with regard to the jury override issue in a motion for rehearing. Further, he did not raise the issue of the propriety of the death penalty for the murder of Amador on this basis before the trial court. Given the unique procedural posture in which Garcia raises this issue, and in light of our reversal of the convictions, we decline to address the merits of this claim in this appeal.

CONCLUSION
Based on the errors discussed above, we reverse Garcia's convictions and vacate the sentences imposed, and we remand this case for a new trial.[14]
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, and PARIENTE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which SHAW and ANSTEAD, JJ., concur.
LEWIS and QUINCE, JJ., concur in result only.
PARIENTE, J., concurring.
I concur in the majority's opinion; however, I conclude that the trial court in the first trial impermissibly overrode the jury recommendation of life and thus Garcia was acquitted of the death penalty as to the murder of Amador.
In Wright v. State, 586 So.2d 1024, 1027 (Fla.1991), the jury recommended a life sentence for the defendant's murder conviction, but the trial court overrode the recommendation. The Court first concluded that the State unconstitutionally exercised a peremptory challenge for racial reasons, and therefore reversed the convictions *570 and resulting sentences. See id. at 1029. The Court then determined that the trial court erred in overriding the jury's recommendation of life. See id. at 1031. The Court also concluded that, as a matter of Florida law, the jury's reasonable recommendation in favor of life imprisonment barred the trial court from subjecting the defendant to the death penalty if he was convicted on remand. See id. Accordingly, the Court concluded:
Under well-settled Florida law, we have held that life imprisonment is the only proper and lawful sentence in a death case when the jury reasonably chooses not to recommend a death sentence. Tedder v. State, 322 So.2d 908 (Fla.1975). Thus, when it is determined on appeal that the trial court should have accepted a jury's recommendation of life imprisonment pursuant to Tedder, the defendant must be deemed acquitted of the death penalty for double jeopardy purposes. Art. I, § 9, Fla. Const.
To rule otherwise would force death-sentenced prisoners to risk giving up the life recommendation by arguing for a new trial, and would place capital appellants in the anomalous position of having to choose between arguing guilt phase or penalty phase issues on appeal, even if they reasonably believe that the trial court committed reversible errors in each phase. Putting capital appellants in the position of having to make this "Hobson's choice" would be fundamentally unfair and inconsistent with the Florida Constitution. Art. I, §§ 9, 17, Fla. Const.
Id. at 1032. In Keen v. State, 775 So.2d 263, 287 (Fla.2000), the Court also addressed the propriety of a jury override and determined that the defendant was acquitted of the death penalty even though we were reversing for a new trial.
Although this Court did not provide an explanation as to why the Court did not address the jury override issue in Garcia's first appeal, it is clear from the face of the opinion that the Court did not address the issue-either explicitly or implicitly. As the majority recognizes, because the Court did not address the issue of the jury override, the issue did not become the law of the case.[15]
If the jury override in the first case was improper, then Garcia would have been acquitted of the death penalty as to the murder of Amador and it would be a manifest injustice not to correct this error at this time. Based on our decisions in Wright and Keen, the jury override was improper; Garcia was thus acquitted of the death penalty as to the murder of Amador.
In the trial court's 1988 sentencing order, the trial court simply weighed the aggravators and mitigators and, after concluding that there was no mitigation, decided to override the jury's life recommendation. This analysis is in direct conflict with the dictates of this Court's decision in Keen. In Keen, this Court articulated the proper analysis for a Tedder inquiry: "The singular focus of a Tedder inquiry is whether there is `a reasonable basis in the record to support the jury's recommendation of life,' rather than the weighing process which a judge conducts after a death recommendation." 775 So.2d at 283-84 (citation omitted).
*571 In Garcia's first trial, there is a reasonable basis in the record to support the jury's recommendation of life. First, the jury in the first trial could have found that Garcia was not the killer. See, e.g., Marta-Rodriguez v. State, 699 So.2d 1010, 1012-13 (Fla.1997) (holding jury recommendation of life reasonable where jury could have believed that defendant was not the murderer based on lack of eyewitness testimony and there was mitigating evidence in the record upon which the jury could reasonably have relied); Cooper v. State, 581 So.2d 49, 51 (Fla.1991) (holding that based on circumstantial evidence, jury could reasonably conclude that another murdered the victim, and therefore jury recommendation of life was reasonable); Pentecost v. State, 545 So.2d 861, 863 (Fla. 1989) (holding that jury recommendation of life was reasonable based upon the testimony at trial suggesting that someone else murdered the victim).
According to the record in the first trial, the weapon that killed Amador differed from the weapon that killed Alfonso, which would be consistent with there having been two killers. Moreover, according to the State's witness Ribera, Garcia consistently referred to Amador as "Mario." However, in describing the Amador and Alfonso homicides to Ribera, Garcia allegedly said it was "the other guy [i.e., not Mario Amador, who] started running upstairs, and I got him and brought him down and we handcuffed him and we put him face down and we executed him." The jury could have concluded that Garcia's alleged admission concerned the shooting of Alfonso, not Amador. This understanding would explain why the jury recommended a life sentence for the death of Amador, but a death sentence for the death of Alfonso.
Second, the jury's life recommendation reasonably could be predicated upon the evidence presented that Garcia had a lesser role than Pardo in planning the crime. This Court has consistently found that the fact that a defendant's accomplice may have been the mastermind constitutes a reasonable basis for recommending a life sentence. See Dolinsky v. State, 576 So.2d 271, 274 (Fla.1991) (concluding that the fact that another was the mastermind of the crime provided a reasonable basis for the jury to recommend a life sentence for the defendant); DuBoise v. State, 520 So.2d 260, 266 (Fla.1988) (holding that jury could have recommended a life sentenced based on the fact that defendant's older brother influenced the eighteen-year-old defendant's behavior); Wasko v. State, 505 So.2d 1314, 1318 (Fla.1987) (holding jury recommendation of life appropriate where jury could have questioned the respective roles of the defendant and his accomplice).
The record indicates that Garcia met Pardo when Garcia was fourteen years old and Pardo was twenty years old. While Pardo became a police officer, got married, and had children, Garcia dropped out of high school, was barely literate, lived in a trailer with his parents, and held a variety of menial jobs. When the police searched Pardo's home, they discovered bazookas, submachine guns, a torpedo shooter, grenade launchers, mach 12s and 45s, as well as a variety of military fatigues and police uniforms, false police identification documents, police radios and walkie-talkies. Moreover, the police search of Pardo's home revealed Pardo's diary of the crimes charged, Robledo's (another victim) credit cards, Pardo's address book with an entry for Robledo, and Amador's INS documents. By contrast, the police search of Garcia's home yielded no evidence of Garcia's connection to these or any other crimes. Furthermore, the record indicates that Pardo had all of the drug contacts and doctored police records, and maintained the diary and the stockpiled weapons. Pardo ordered and paid for the handguns *572 Garcia purchased with Amador's driver's license. Based upon these facts, the jury had a reasonable basis to recommend a life sentence.
A third basis for the jury's life recommendation is the defense's penalty phase closing argument that Garcia could serve two consecutive life sentences without the possibility of parole for fifty years for the two first-degree murder convictions. This Court has recognized that this fact is a mitigating circumstance upon which the jury could reasonably rely in recommending a life sentence. See Marta Rodriguez, 699 So.2d at 1013; Turner v. State, 645 So.2d 444, 448 (Fla.1994).
Finally, this Court has considered the State's advice to the trial judge not to override a life recommendation as an indication that the life recommendation is reasonable. See Turner, 645 So.2d at 448 n. 4; Pomeranz v. State, 703 So.2d 465, 473 (Fla.1997) (Anstead, J., concurring). At the 1988 sentencing, the State submitted a sentencing memorandum to the trial court specifically advising it not to override the jury's life recommendation:
Because the jury's recommendation "... is entitled to great weight, reflecting as it does the conscience of the community, and should not be overruled unless no reasonable basis exists for the opinion," ... the State submits that this Court should follow the jury's recommendation.

(Emphasis supplied.) Therefore, the State's request that the trial court accept the jury's recommendation demonstrates the reasonableness of the jury's recommendation.
For all these reasons, I would find that there is reasonable basis in the record to support the jury's recommendation of life. Therefore, I would conclude that the jury override was improper; that Garcia was acquitted of the death penalty for Amador; and that upon retrial, the maximum penalty Garcia can face for the murder of Amador is life imprisonment. See Keen, 775 So.2d at 287.
SHAW and ANSTEAD, JJ., concur.
NOTES
[1] Garcia also was charged with a ninth murder that occurred in 1986, which was the murder of Michael Millot, but that case was assigned a separate case number than the other eight.
[2] Initially, Pardo and Garcia were tried together, but the first trial ended in a mistrial when the trial court determined that Garcia's motion for severance from Pardo should be granted.
[3] Pardo was convicted of nine counts of first-degree murder and related charges, which occurred in five separate episodes, and he was sentenced to death on each of the murder charges. This Court affirmed Pardo's convictions and death sentences. See Pardo v. State, 563 So.2d 77, 81 (Fla.1990).
[4] Two of the eight homicide counts-those related to Sara Musa and Fara Quintero-were severed. See Garcia v. State, 568 So.2d 896, 897 (Fla.1990).
[5] The Musa and Quintero case is still pending.
[6] In response to the court's inquiry, defense counsel proffered possible statutory mitigation: (1) Garcia's age at the time the crimes were committed (twenty-three); (2) lack of significant history of prior criminal activity; (3) that Garcia was an accomplice in the capital felony committed by another person (Pardo) and Garcia's participation was relatively minor; and (4) that Garcia acted under extreme duress or the substantial domination of another. As for nonstatutory mitigation, defense counsel proffered: (1) the length of the potential minimum mandatory sentences; (2) the lack of intent to kill; (3) good conduct during the trial; (4) that Garcia may not have been the trigger person; and (5) that Garcia has a family who loves him.
[7] The court found three aggravating factors for both murders: (1) previous conviction of a capital felony (great weight); (2) murder committed during the course of a robbery and pecuniary gain (merged) (no weight given); and (3) CCP (no weight given). With regard to mitigating circumstances, the court explained:

This court finds that the defendant has failed to establish any statutory or nonstatutory mitigating circumstances because he voluntarily waived his right, against the advise of counsel and the court, to present such evidence. Further, the court finds that the defendant, after a lengthy colloquy by the court, voluntarily and knowingly waived his right to challenge any of the aggravating circumstances presented by the State. Therefore, the trial record for both the guilt and penalty phase is devoid of any evidence convincing this court [of] the existence of any of the following mitigating circumstances: [mitigating circumstances listed].
[8] The six guilt phase issues are: (1) failure to allow Garcia to impeach Ribera with his prior inconsistent statements; (2) allowing the lead detective and the prosecutor to improperly vouch for the credibility of the State's key witness; (3) failure to admit Pardo's exculpatory testimony; (4) admitting evidence from Pardo's diary; (5) admitting hearsay statements by the victim and others that they did not trust and were afraid of Garcia; and (6) the cumulative effect of the trial errors.
[9] The four penalty phase issues are: (1) failure to allow the jury to consider Pardos' former testimony at the penalty phase; (2) failure to consider any of the mitigating circumstances proposed by defense counsel; (3) unconstitutionality of the Florida's death penalty statute; and (4) that the override of the previous jury's life recommendation for the Amador homicide constituted an acquittal of the death penalty and, therefore, the State was barred from seeking the death penalty a second time.
[10] Ribera's videotaped statements had not been made available to Garcia until after this Court remanded his case for a new trial in 1990. Accordingly, the exclusion of Ribera's statements was not an issue in Garcia's first trial. Garcia points out, however, that in his trial for the murder of Millot, another trial court had allowed the use of these statements as impeachment of Ribera. Garcia was acquitted in that case.
[11] The severance of the trials of Pardo and Garcia occurred before Pardo's trial, and therefore Garcia was not a codefendant in Pardo's trial.
[12] Garcia also argues that the statement should have been admitted under section 90.804(2)(c), governing statements against interest. However, that ground was not raised below and thus we do not address whether this would be a proper basis for its admission.
[13] In this Court's prior opinion, the Court mistakenly stated that the jury's life recommendation was for the murder of Roberto Alfonso, when in fact it was for the murder of Mario Amador. See Garcia, 568 So.2d at 897.
[14] We expressly do not address the remaining guilt phase and penalty issues Garcia raises in this appeal.
[15] Even if the issue had been decided, as we have recognized, "[t]his Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become the law of the case." State v. Owen, 696 So.2d 715, 720 (1997); see also Preston v. State, 444 So.2d 939 (Fla.1984).