NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

CHAUNCEY GARDNER,           )
                            )
            Appellant,      )
                            )
v.                          )           Case No. 2D13-3621
                            )
STATE OF FLORIDA,           )
                            )
            Appellee.       )
_____)

Opinion filed March 23, 2016.

Appeal from the Circuit Court for Polk
County; Donald G. Jacobsen, Judge.

Howard L. Dimmig, II, Public Defender,
and Terri L. Backhus, Special Assistant
Public Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Susan D. Dunlevy,
Assistant Attorney General, Tampa, for
Appellee.


ALTENBERND, Judge.

Chauncey Gardner appeals his judgments and sentences for aggravated

child abuse and aggravated manslaughter of his infant child. See §§ 782.07(3),

827.03(2)(c), Fla. Stat. (2009). We affirm, but we write to address two of the issues

raised by Mr. Gardner.

Tivasha Logan gave birth to Mr. Gardner's child on May 11, 2009. This was their fourth child together. The infant, a girl, was born ten weeks premature. Although the infant initially had some trouble with bottle feeding, she thrived in the hospital neonatal unit and was discharged to the care of her mother at the end of July 2009. Three months later, the infant died of malnutrition.

There is no question that Ms. Logan received training at the hospital on the care of this infant. The infant was to receive a high calorie formula that could only be obtained with a prescription, and arrangements were made for the mother to obtain the formula without charge. Hospital staff also helped the mother make an appointment with a physician following the infant's discharge. But during the last two months of the infant's life, she was given watered-down, standard formula. The infant was not taken for medical care after she was sent home.

For the child's death, Ms. Logan was charged with first-degree felony murder, aggravated manslaughter of a child, and aggravated child abuse. At her trial in 2012, she was convicted of first-degree felony murder. The court sentenced her to life in prison. This court affirmed her direct appeal in July 2015. See Logan v. State, 177 So. 3d 616 (Fla. 2d DCA 2015) (table decision in case number 2D12-4191).

Mr. Gardner's involvement with the child was less than the mother's because his relationship with Ms. Logan was unstable. His culpability for the death was a much closer issue. The State charged him with the same offenses as the mother: first-degree felony murder, aggravated manslaughter of a child, and aggravated child abuse. His trial took place in June 2013. A jury convicted him of the lesser-included

offense of manslaughter, aggravated manslaughter of a child,[1] and aggravated child abuse. Due to double jeopardy concerns, the trial court entered judgment and sentenced Mr. Gardner only for a single manslaughter, the manslaughter of a child. The trial court also entered a judgment and sentence for aggravated child abuse. Mr. Gardner was sentenced to concurrent terms of thirty years in prison as a prison releasee reoffender. The State also sought to sentence Mr. Gardner as a habitual felony offender. But the trial judge, who had also presided over Ms. Logan's trial, declined to sentence Mr. Gardner as a habitual felony offender because he found Mr. Gardner to be less culpable than the mother and because Mr. Gardner's prior felonies were not violent. Mr. Gardner appeals his judgments and sentences.

Mr. Gardner first argues that he was entitled to a judgment of acquittal because the evidence was insufficient to support his convictions and to a new trial because the verdict was against the weight of the evidence. Although the evidence of his guilt is much weaker than that against Ms. Logan, the trial court did not err in denying the motion for a judgment of acquittal. As to the charges for which Mr. Gardner was convicted, the trial court also did not abuse its discretion in denying his motion for a new trial. See Ferebee v. State, 967 So. 2d 1071, 1072-73 (Fla. 2d DCA 2007) (discussing the standard of review on a motion for new trial); Persad v. State, 859 So. 2d 535, 535 (Fla. 4th DCA 2003) (Hazouri, J., concurring) (concurring in the affirmance of the denial of a motion for new trial but writing to express concerns as to whether the weight of the evidence supported the conviction).

---

[1]Section 782.07(3) provides that "[a] person who causes the death of any person under the age of 18 by culpable negligence under s[ection] 827.03(3) commits aggravated manslaughter of a child, a felony of the first degree . . . ."

Mr. Gardner next argues that the trial court abused its discretion in denying his motion to introduce the discovery deposition of Ms. Logan, as substantive evidence at his trial, after Ms. Logan became unavailable to testify because she invoked her Fifth Amendment right against self-incrimination. He argues primarily that under Chambers v. Mississippi, 410 U.S. 284 (1973), his due process rights were violated when the trial court excluded this evidence. Although we reject his argument, it warrants some discussion.

Ms. Logan had not testified at her own trial. When her direct appeal was pending in this court, Mr. Gardner listed Ms. Logan as a possible witness at his trial, and the State subpoenaed her for a deposition to take place in the beginning of April 2013. Only Ms. Logan's appellate counsel attended to represent her at the deposition. Ms. Logan answered many questions in this discovery deposition. Her testimony was not a classic confession and it did not fully exonerate Mr. Gardner, but it did support Mr. Gardner's claim that he was not present in Ms. Logan's home for most of the last two months of the infant's life. Indeed, Ms. Logan's deposition testimony places Mr. Gardner in the home during this period even less than Mr. Gardner's own testimony at trial.

In her deposition, Ms. Logan stated that she kicked Mr. Gardner out of her home "completely" two weeks after she brought the infant home from the hospital. She claimed that Mr. Gardner moved in with his sister and never returned to live with Ms. Logan and the children. Mr. Gardner would visit the children once every three weeks. Each time, he would stay for perhaps twenty minutes but less than an hour. He did not feed or bathe the children, including the infant. According to Ms. Logan, after she

kicked Mr. Gardner out, the only time Mr. Gardner spent the night in Ms. Logan's home or fed the infant was on Halloween, the night before the child died.

On April 16, 2013, a week before Mr. Gardner's trial, the State filed a motion to determine whether Ms. Logan would testify at Mr. Gardner's trial or whether she would invoke her Fifth Amendment privilege against self-incrimination. The State's motion was heard by the trial court over the course of three days, beginning on April 18 and continuing until after jury selection. In its motion and again at the hearing, the State explained its position that Ms. Logan had statutory use and derivative use immunity for her deposition testimony because the State had subpoenaed her. See § 914.04, Fla. Stat. (2012). But the State made clear that it would not grant immunity for any of Ms. Logan's testimony if she decided to testify at Mr. Gardner's trial. It thus represented that any testimony by Ms. Logan at Mr. Gardner's trial would be admissible against her in any subsequent trial, hearing, or proceeding. After Ms. Logan's appellate counsel withdrew and the trial court brought in more experienced trial counsel to advise Ms. Logan, Ms. Logan invoked her privilege against self-incrimination. At that point, the trial court ruled without objection that Ms. Logan was unavailable for purposes of trial. It further found that, as explained in Fountaine v. State, 460 So. 2d 553 (Fla. 2d DCA 1984), only the State had the authority to grant immunity for testimony and that neither the court nor the defendant could compel it to do so.

Mr. Gardner's attorneys argued that although Ms. Logan's deposition testimony was hearsay, it should be admissible on three separate, but overlapping, grounds: as prior testimony under section 90.804(2)(a), Florida Statutes (2012), as a statement against penal interest under section 90.804(2)(c), and as exculpatory

- 5 -

evidence pursuant to Chambers. After careful consideration, the trial court concluded that Ms. Logan's testimony was not admissible as former testimony because it was taken as a discovery deposition pursuant to Florida Rule of Criminal Procedure 3.220(h) and not as a deposition to perpetuate testimony for use at trial in compliance with rule 3.190(i).[2] The court correctly noted that the supreme court held in State v. Lopez, 974 So. 2d 340 (Fla. 2008), and Rodriguez v. State, 609 So. 2d 493 (Fla. 1992), that a deposition that does not meet the requirements of rule 3.190(i) is not admissible as substantive evidence in a criminal case.

The trial court noted its concern with the potential unfairness that Ms. Logan's unavailability was caused in part by the State's refusal to grant her immunity despite the fact that she already had been tried and convicted as charged. The court thus considered the principle from Chambers that in certain instances a defendant's constitutional right to present exculpatory evidence may override state rules of evidence. But it agreed with the reasoning of the Third District in Ducas v. State, 84 So. 3d 1212, (Fla. 3d DCA 2012), in which the district court had rejected the same argument from Chambers that Mr. Gardner was making at the hearing. Finally, the trial court concluded that the deposition in its entirety could not be admitted as a statement against interest.

We address only the application of Chambers and agree with the trial court that the reasoning in Ducas applies in this case. We decline to conflict with Ducas, and although there are some differences in this case, we cannot conclude that

---

[2]Rule 3.190(i) was previously codified as rule 3.190(j), but the supreme court changed the lettering of the rule in 2009. See In re Amends. to the Fla. Rules of Crim. Proc., 26 So. 3d 534, 539-40 (Fla. 2009).

they change the outcome.  See also Leighty v. State, 981 So. 2d 484, 494 (Fla. 2008) (holding that "[u]nder the facts of this case, the state did not have a fair opportunity to test the reliability of" the hearsay testimony of a confession in a discovery deposition and thus Chambers did not "trump" the inadmissibility of the deposition under Florida's rules of evidence and criminal procedure).

In Chambers, the U.S. Supreme Court held that the trial court's failure to allow Mr. Chambers to cross examine a witness and to introduce three of the witness's out-of-court confessions to the crime for which Mr. Chambers was accused had deprived Mr. Chambers of his right to present witnesses on his own behalf and thus of a fair trial.  Chambers, 410 U.S. at 302-03.  Regarding the confessions, the Court explained that the purpose of the hearsay rule is to prevent parties from presenting untrustworthy evidence to the jury.  Id. at 299.  It concluded that the oral confessions were not only critical to Chambers' defense but "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability."  Id. at 298-300.  Specifically, (1) each of the confessions "was made spontaneously to a close acquaintance shortly after the murder had occurred," (2) each was corroborated by other evidence in the case, including the other confessions, (3) each confession was "in a very real sense self-incriminatory and unquestionably against" the interest of the declarant, and (4) if there had been any question about the credibility of the confessions, the declarant was present in the courtroom and could have been cross-examined on the matter under oath.  Id. at 300-01.

We recognize that it is an awkward fit to apply the factors from Chambers to determine whether the discovery deposition of an unavailable witness is admissible

as substantive evidence at trial. Nevertheless, these four factors do not demonstrate that Ms. Logan's discovery deposition, which was taken after she was convicted and was already serving a life sentence, bore "persuasive assurances of trustworthiness." See id. at 302. As to the first factor, obviously Ms. Logan's statements were not made "spontaneously" to a friend or anyone else. See id. at 300.

The second factor, whether Ms. Logan's critical statements were corroborated by other evidence in the case, is more difficult. See id. Regarding this inquiry, our supreme court recently defined "corroborative evidence" as evidence that is admissible

> "to strengthen a witness' testimony by evidence of matters showing its consistency and reasonableness and tending to indicate that the facts probably were as stated by the witness." Chaachou v. Chaachou, 73 So.2d 830, 837 (Fla. 1954). Corroborating evidence is defined as "[e]vidence that differs from but strengthens or confirms what other evidence shows (esp. that which needs support)." Black's Law Dictionary 674 (10th ed. 2014).

Bearden v. State, 161 So. 3d 1257, 1266 (Fla. 2015) (alteration in original).

The fact that Ms. Logan kicked Mr. Gardner out of her home at some point after she brought the infant home from the hospital was corroborated by the testimony of Mr. Gardner, his stepmother, his father, and his two sisters. Ms. Logan's ten-year-old son, Mr. Gardner's stepson, was the only witness who testified that Mr. Gardner lived in the home the entire time. Mr. Gardner's stepmother, who was called by the State, testified that Mr. Gardner was afraid that the infant was not thriving but was also afraid to challenge Ms. Logan and to intervene with the child's care in the face of Ms. Logan's threats. But Ms. Logan's statements regarding the extent to which Mr. Gardner was in the home and involved in the infant's care—in particular that Mr. Gardner did not feed

- 8 -

the infant for the entire two and a half months before her death with the exception of Halloween—differed significantly even from Mr. Gardner's own testimony.

Mr. Gardner testified that Ms. Logan kicked him out sometime in mid-September. Although he lived with his sister until the infant died, he would visit the children and care for them, sometimes for short periods but sometimes overnight or for the weekend. He helped feed the infant when he was there. But he had very little contact with the infant in the month before her death because Ms. Logan ignored his calls and would not let him visit.

In our view, the fact that Ms. Logan stated that Mr. Gardner's involvement with the child was significantly less than what Mr. Gardner himself claimed tends to make Mr. Gardner's testimony more credible but Ms. Logan's testimony less credible. Thus, although this factor demonstrates that Ms. Logan's deposition testimony may have been helpful to Mr. Gardner's defense, it does not suggest that her statements were trustworthy.

As to the third factor from Chambers, Ms. Logan's statements were not "in a very real sense self-incriminatory and unquestionably against [her] interest." See Chambers, 410 U.S. at 284. This was not a case in which Ms. Logan said "I am guilty and the defendant is not." Rather, her statements tended to emphasize her culpability while minimizing Mr. Gardner's. But the fact is they could both have been responsible for what happened to the child. Although it is not clear from the record whether Ms. Logan understood that she had immunity for what she said during the deposition, she had already been convicted of first-degree murder and sentenced to life in prison. It was clearly in her best interest not to make incriminating statements in case she

eventually won her appeal and was entitled to a new trial. Incriminating statements would also harm her chances of success on any postconviction claim. But Ms. Logan did not have as much to lose after her trial as she did before her trial. And prior to her trial, she had made statements to law enforcement that Mr. Gardner lived with her full time and shared responsibility for the child until the child's death.

Finally, as to the fourth factor in Chambers, because Ms. Logan invoked her Fifth Amendment privilege, she was obviously not available for cross-examination at Mr. Gardner's trial to dispel "any question about the truthfulness of [her deposition] statements." See Chambers, 410 U.S. at 301. Mr. Gardner argues that the reliability of Ms. Logan's statements was tested by the State when it took her deposition and that the rationale for excluding discovery depositions as substantive evidence does not apply in this case for several reasons. First, it was the State that took Ms. Logan's deposition, and it was therefore able to question her at length. Second, it did so with a motive to discredit Ms. Logan because she was Mr. Gardner's codefendant. And finally, the State had already tried Ms. Logan for the same crime and already had extensive knowledge of the facts and the case. See Lopez, 974 So. 2d at 347, 349 (explaining that discovery depositions, unlike depositions to perpetuate testimony, are customarily "used to learn what the testimony will be" or to "uncover[] other evidence or reveal[] other witnesses").

But we have reviewed Ms. Logan's deposition and cannot conclude that the reliability of Ms. Logan's statements was sufficiently tested when the State deposed her. The State likely would have proceeded differently had it known that Ms. Logan's deposition would be admissible at trial. For example, it may have cross-examined Ms. Logan regarding her testimony that she kicked Mr. Gardner out soon after the infant

came home and that Mr. Gardner had little contact with the infant after that point. The State may also have attempted to impeach Ms. Logan with her own prior statements to law enforcement. Without notice that Mr. Gardner intended to use the deposition as substantive evidence at trial, "the State had neither the motive nor the opportunity to develop [Ms. Logan's] testimony further to test its reliability." Ducas, 84 So. 3d at 1217 (citing Leighty, 981 So. 2d at 493-94; Rodriguez, 609 So. 2d at 499). Thus, we conclude that the factors from Chambers do not demonstrate that Ms. Logan's statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." Chambers, 410 U.S. at 300.

We are not convinced that the factors in Chambers are the only factors that might require rules of evidence or procedure to be overridden in order to allow a defendant a fair trial in a criminal case. See, e.g., Bearden, 161 So. 3d at 1265 n.3 ("Chambers does not necessarily establish an immutable checklist of four requirements. Instead, the primary consideration in determining admissibility is whether the statement bears sufficient indicia of reliability." (quoting Bearden v. State, 62 So. 3d 656, 661 (Fla. 2d DCA 2011), quashed, 161 So. 3d 1257)). But Mr. Gardner has not argued and the record does not reveal any other indicia demonstrating the reliability of Ms. Logan's deposition statements.

Finally, we suspect that the due process analysis in Chambers may involve a balance between the importance of the excluded evidence to the defense and the reliability of that evidence. See Chambers, 410 U.S. at 302-03. We have considered whether the relative weakness of the State's case against Mr. Gardner might warrant the admissibility of this deposition. But the weakness of that evidence does not

strengthen the reliability of Ms. Logan's testimony. And although Ms. Logan's deposition testimony would have added some support for Mr. Gardner's defense, her testimony is not a confession that exonerates him and is to a large extent another version of the events. See Ducas, 84 So. 3d at 1216 (concluding that statements from a discovery deposition were not admissible under Chambers because the statements were "nothing akin to the murder confession against penal interest involved in Chambers" and because the reliability of the statements could not be tested).[3] It was undisputed that Mr. Gardner was at the home on Halloween, the night before the infant died, and that he mixed and fed the infant her last watered-down bottle of formula. Mr. Gardner himself testified that he saw the infant two weeks before Halloween and that she looked small, although not like she was starving. Thus, it was undisputed that Mr. Gardner had some involvement with the infant before she died.

Given the availability of depositions to perpetuate testimony for use at criminal trials, to broaden Chambers to require the trial court to admit Ms. Logan's discovery deposition in this context would substantially alter our rules of procedure under circumstances that do not rise to the level of the due process violation in Chambers.

Affirmed.

SILBERMAN and KELLY, JJ., Concur.

---

[3]Our research suggests that the cases in which defendants have been afforded relief under Chambers typically involve confessions by either a codefendant or third party that, if believed, would have fully exonerated the defendant. See Bearden v. State, 161 So. 3d 1257 (Fla. 2015); Garcia v. State, 816 So. 2d 554 (Fla. 2002); Curtis v. State, 876 So. 2d 13 (Fla. 1st DCA 2004); cf. Czubak v. State, 644 So. 2d 93 (Fla. 2d DCA 1994).