TAYLOR, J.
Derek Martin appeals his conviction for first-degree felony murder. He argues that the trial court reversibly erred in denying his motion for mistrial after previously redacted portions of his taped police interrogation were erroneously played to the jury. These portions of the interrogation had been redacted because they im-permissibly suggested that his co-defendants, and other unnamed witnesses, had implicated Martin in the murder.[1] We reverse.

Factual Background

Martin’s sister, Roxanne, testified at trial that she, Martin, co-defendant Sasha Bowen, and co-defendant Jose Gordon were together at Gordon’s house on the night of June 4, 2008. Roxanne said that the three men discussed going to buy a pound of marijuana from someone Gordon knew. She admitted that she had previously told the police that they discussed “doing a jack for a pound of weed,” but said her original statement was false — the result of intoxication and police intimidation. Roxanne also denied previously telling the police that the three men were armed with Martin’s gun (a .38 revolver) when they left to get the marijuana. The three men departed in Martin’s black pickup truck.
Arthur Tobin, Sr., the victim’s father, woke to the sound of gunshots around midnight. He rushed outside and ran down the stairs of his front porch. His son, Artie Tobin, was lying motionless on his back at the foot of the stairs. When Arthur rolled his son over, he saw blood trickling from his son’s mouth. He shook his son’s body and screamed his name. The young man remained still; he was dead.
Several neighbors, who were also awakened by the gunshots, gave their recollection of the night’s events. One neighbor saw a truck, which she described as a “dark S10 Ford Ranger,” at the end of the victim’s driveway. The truck sped away after a man dressed in dark clothing jumped into the truck’s bed. DNA collected from blood found at the end of the driveway matched Bowen’s DNA.
Another neighbor saw Gordon lingering at the edge of the driveway just after the shooting. The neighbor confronted Gordon. Gordon said he had been in the neighborhood to buy some marijuana from the victim, and that he was standing outside the victim’s home when someone walked up to the victim, put a gun to his head, and pulled the trigger. The neighbor, aware that Gordon did not live in the neighborhood, refused to let him leave the scene until the police arrived. Once the police arrived on the scene, Gordon was taken into custody on an outstanding warrant for violation of probation.
Gordon’s cell phone was recovered at the scene. The phone had received several missed calls from Bowen’s phone. All of the calls had been placed after the victim was shot. Detectives traced phone calls and text messages from Gordon’s phone to the victim. The messages revealed that Gordon had agreed to buy marijuana from the victim shortly before he was shot.
Martin and Bowen went to Bowen’s home after the shooting. Witnesses saw Martin’s black truck parked in Bowen’s driveway. Both men were distraught. A friend of the two men, present at Bowen’s home, testified that Bowen was wearing a *539 dark shirt, military fatigues, and bleeding from a cut above his eye. She also testified that, upon walking through the door, Bowen stated, “I shot the kid. I shot him twice. I killed him.” Martin told him to be quiet. They borrowed a cell phone and attempted to contact Gordon, whom they had left at the scene. Martin and Bowen then left in Bowen’s jeep and began searching for Gordon. Unable to find him, they separated.
Bowen, still distraught, sought refuge with a friend. She testified that, while she tended to his eye, he told her that he, Martin, and Gordon had gone to rob someone in western Hollywood and it had gone bad. He confessed that he had shot the victim and fled with Martin; Gordon was left behind.
Martin also sought the aid of a friend. At trial, this friend testified that he was at home when Martin arrived with cash and a revolver. Martin told his friend that he had gotten himself into trouble. He asked his friend to get rid of the gun for him. The friend agreed. The Hollywood Police Department ultimately recovered the gun while conducting an unrelated investigation. At trial, the state’s forensic expert testified that the bullets that killed the victim could have been fired by the gun, a .38 revolver. However, while the grooves and markings on the bullets that killed the victim were consistent with the grooves and markings fired by the gun recovered by police, the bullets were too damaged in the shooting to be definitively linked to the weapon. Additionally, the bullets could have been fired by any .38 caliber weapon or .357 Magnum.
Martin drove to his mother’s home in Hallandale close to five o’clock in the morning on June 5. He needed a place to sleep, and his mother gave him her bed. After a few days in Hallandale, his mother informed him that a warrant had been issued for his arrest in connection with the murder of Artie Tobin. He decided to turn himself in.
Another one of Martin’s friends testified that, before turning himself in, Martin attempted to call her boyfriend. The boyfriend was not home, so she answered his phone for him. Martin asked her to tell the police that he had been with her on the night of the murder. At trial, she reluctantly admitted that Martin asked her to lie.
After entering the police station, Martin was detained, placed in an interrogation room, and given his Miranda[2] warnings. He waived his rights and agreed to speak with the detectives. Martin stated that he had loaned his truck to Gordon one or two nights earlier. He acknowledged being with the co-defendants (and others) at Gordon’s house earlier on the night of the murder, but said he walked to a friend’s house and did not recover his truck until later when he saw it in Gordon’s backyard with the keys in the ignition. Martin said that, sometime after he recovered his truck, Gordon told him that the truck had been stolen while Gordon was using it, and that someone had gotten shot. Martin stated that he drank too much that night and did not remember much about what happened. He denied having a gun and explained that he went to Palm Beach County because he was nervous. He said he had met the victim only once or twice.
During questioning, a detective told Martin that he knew Martin was at the scene when the victim was shot, and he implied that Gordon and Bowen, as well as other witnesses, had implicated him in the murder. The detective stated:
*540 Let me tell you something. I had two people sit where you sat, and both of them tell me you were there. Okay? I have other independent people tell me you were there. So I know you were there. If you want to play this game where you don’t know what happened, then go ahead and start from the beginning.
Before trial, the parties agreed that this statement would be redacted from the taped interrogation. However, when the tape was played for the jury, this statement was inadvertently left in. Defense counsel moved for a mistrial. The court denied the motion and instructed the jury as follows: “[wjhat the detectives say on the recording is not evidence and you are not to consider it as such.” The state did not mention the erroneously admitted statement during closing argument. The jury found Martin guilty of murder in the first degree. He was sentenced to life in prison without the possibility of parole.

Analysis

A trial court’s ruling on a motion for mistrial will not be reversed absent an abuse of discretion. Tai A. Pham v. State, 70 So.3d 485, 493 (Fla.2011). “A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial.” Id. (quoting England v. State, 940 So.2d 389, 401-402 (Fla.2006)) (internal citation omitted).
The state acknowledges that it was error for the redacted statements to be played before the jury. See, e.g., Postell v. State, 398 So.2d 851, 855 (Fla. 3d DCA 1981) (footnotes omitted) (“We hold that where, as in the present case, the inescapable inference from the testimony is that a non-testifying witness had furnished the police with evidence of the defendant’s guilt, the testimony is hearsay, and the defendant’s right of confrontation is defeated, notwithstanding that the actual statements made by the non-testifying witness are not repeated.”). However, the state argues that the admission of the statements was not so prejudicial as to vitiate the entire trial. We disagree.
The admission of an out of court statement that the defendant engaged in the criminal activity for which he is being tried is inherently prejudicial. State v. Baird, 572 So.2d 904, 908 (Fla.1990); see also Conley v. State, 620 So.2d 180, 182-83 (Fla.1993) (holding that dispatcher’s statement that “a man [was] chasing a female down the street ... the man supposedly had some type of gun or rifle,” as related by the investigating officer, was inherently prejudicial and harmful error); Wilding v. State, 674 So.2d 114, 119 (Fla.1996) (“Placing information before the jury that a non-testifying witness gave police reliable information implicating the defendant in the very crime charged clearly could affect the verdict.”), receded from on other grounds by Devoney v. State, 717 So.2d 501 (Fla.1998); Keen v. State, 775 So.2d 263, 273 (Fla.2000) (“[I]t is impermissible for the State to have the benefit of statements from mystery witnesses or sources without the defendant having the right of confrontation and cross-examination.”); Banks v. State, 790 So.2d 1094, 1099 (Fla.2001) (holding that detective’s interpretation of non-testifying witness’s statements that the defendant was “cool” and “straight up,” combined with hearsay statements that the defendant expressed concern that the undercover officer was a snitch constituted harmful error); Tosta v. State, 786 So.2d 21, 24 (Fla. 4th DCA 2001) (holding that it was harmful error for officer to relay radio statement that the defendant was behind the wheel of a stolen vehicle, and that the trial court abused its discretion when it denied the motion for a mistrial); K.V. v. State, 832 So.2d 264, 266 (Fla. 4th DCA 2002) (holding that it was harm *541 ful error for victim to relate statements of unidentified friends that the defendant was going to target his home for a burglary).
In Keen, the Florida Supreme Court equated the inherently harmful effect the admission of collateral crime evidence has on a jury’s verdict to the inherently prejudicial effect the admission of hearsay evidence implicating the defendant has on a trial. 775 So.2d at 275 (citing Czubak v. State, 570 So.2d 925, 928 (Fla.1990)). “The nature of the inadmissible materials here consisting of very harmful hearsay evidence indicating that the defendant was guilty of the crime charged is far more egregious and harmful than the admission of material directed to an unrelated collateral wrong ... we conclude that the standard applied in Czubak should be applied here under these particular circumstances.” Id.
In this case, portions of the police interrogation played for the jury implied that the co-defendants had made statements to the police that Martin was involved in the murder for which he was on trial. This material was inherently prejudicial and deprived Martin of a fair trial. The state’s case against Martin was largely circumstantial. No witnesses saw Martin at the scene of the crime — only a dark truck, resembling Martin’s vehicle, was seen leaving the victim’s home. Additionally, no forensic evidence directly linked Martin to the crime. The state’s case was significantly buttressed by the erroneously admitted material from Martin’s statement. The statement gave the jury an abundance of witnesses who claimed to have seen Martin at the scene of the crime when the victim was murdered. First, the detective stated that “two people,” presumably co-defendants Bowen and Gordon, had been interrogated by police officers, and both had implicated Martin. Second, the detective stated that he corroborated the statements of the “two people” by speaking to “other independent people.” Finally, after speaking with these other sources, the detective “knew” that Martin had been at the scene of the crime when the victim was murdered. Furthermore, the defense was surprised by the admission of the statement since the state had previously agreed to redact it. See Gonzalez v. State, 777 So.2d 1068, 1069-70 (Fla. 3d DCA 2001) (holding that the surprise admission of improper testimony constituted a “trial by ambush” and was “inherently prejudicial”).
We have repeatedly held that the testimony of unnamed witnesses implicating the defendant in a crime is both improper and harmful. See, e.g., Hurst v. State, 842 So.2d 1041, 1043-44 (Fla. 4th DCA 2003) (holding that the state failed to show that officer’s testimony was harmless when officer recounted confidential informant’s description and identification of the defendant); see also Saintilus v. State, 869 So.2d 1280, 1282 (Fla. 4th DCA 2004) (holding that the state failed to show that admission of informant’s testimony was harmless when “the only purpose of this testimony was to admit these hearsay statements to link defendant to the crimes,” and there was conflicting testimony regarding the perpetrator’s identity). The Florida Supreme Court’s language in Keen is clear: “[hearsay statements relating accusatory information] simply should not [be] permitted, and when the motion for mistrial [is] made after such evidence [comes] before the jury, a mistrial should [be] granted.” 775 So.2d at 275-76.
Because we conclude that the trial court should have granted Martin’s motion for mistrial, we reverse and remand for a new trial. We find, however, no error in the trial court’s denial of Martin’s motion to suppress those parts of his interrogation made after his statement that he may need a lawyer. See Davis v. United *542 States, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); see also State v. Owen, 696 So.2d 715, 719 (Fla.1997) (holding that interrogating officers are not required to clarify an “equivocal or ambiguous request to terminate an interrogation after [a defendant has] validly waived his or her Miranda rights”). Nor do we find any error in the manner in which the trial court conducted a Nelson[3] hearing.

Reversed and Remanded for a new trial.

GERBER and LEVINE, JJ., concur.

. The defendant and co-defendants were tried separately. Neither of the co-defendants testified at the defendant’s trial.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).